David B. ARCHER, Patricia J. Archer, Shelly Mae Chambers, and Helen Marie Chambers, Appellants,

v.

OUTBOARD MARINE CORPORATION, Respondent.

No. WD 50109.

Missouri Court of Appeals, Western District.

Aug. 1, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 1995.

Application to Transfer Denied Nov. 21, 1995.

Paul Redfearn II, W. James Foland, Kansas City, for appellants.

W. James Foland, Karen Glickstein, Kansas City, Richard A. Bowman, Minneapolis, Minn., for respondent.

Before LAURA DENVIR STITH, P.J., and BERREY and SPINDEN, JJ.

SPINDEN, Judge.

The appellants ask us to determine whether the principal sponsor of a bass tournament assumes liability for a contestant's recklessness when the sponsor does not control the

tournament but supplies prizes, displays product logos at the tournament and negotiates minimal safety rules. The circuit court concluded that such a sponsor was not liable for a fatal collision of a tournament competitor's boat and another boat not involved in any way in the tournament. The circuit court entered summary judgment for the tournament sponsor, and we affirm.

Harold McCullough was competing in a Fisherman's AmBASSadors Association (FAA) tournament at the Lake of the Ozarks on April 17, 1988, when his bass boat crashed into a john boat in which Ralph Chambers and David Archer were riding. McCullough's bass boat severed the john boat, killing Chambers and seriously injuring Archer. Authorities convicted McCullough of reckless boating.

The FAA was an unincorporated association organized to stage professional bass tournaments. Its president and chief executive officer, Charles Word, directed the association's tournaments. Outboard Marine Corporation (OMC) was one of 19 sponsors of FAA's tournaments, but it was not involved in running FAA's tournaments.

The appellants sued FAA, Word, and all 19 tournament sponsors, but they did not sue McCullough. Archer sought damages for his injuries, and his wife sought recovery for loss of consortium. Chambers' widow and mother requested wrongful death damages. The sponsors moved for summary judgment on all counts. On June 3, 1992, the circuit court dismissed the appellants' claims against all of the sponsors except for OMC. The court concluded that OMC, "unlike the other 'sponsors' of the tournament exercised some control over the F.A.A. and ... Word, including implementation of certain safety regulations and imposing some reporting requirements of ... Word for the F.A.A. to" OMC. On June 27, 1994, the court granted OMC's renewed motion for summary judgment, finding that "the uncontroverted facts show that OMC did not exercise control or have the right of control over the FAA." The court also found as a matter of law that the allegations in appellants' petition "based on negligence or other theories not requiring control

by OMC do not state a claim against OMC since OMC had no legal duty to [appellants] that would give rise to any such claim."

■ Central to the appellants' claim that OMC was liable for Chambers' death and Archer's injuries is a contention that bass tournaments on public lakes presented an unreasonable danger of injury to the public. An article published by FIELD AND STREAM magazine best summarizes the basis for their claim:

The reckless operation of high-speed fishing boats stems in part from tournaments, in which the stakes are high and a win-at-all-costs mentality is encouraged by the amount of prize money involved. The attitude becomes: Don't waste one second of possible fishing time; get to the hotspot before the other guy; a few seconds equals a few more ounces of fish flesh equals a few more bucks and greater glory.

Ken Schultz, *Wild Eyes and Roostertails,* FIELD AND STREAM, July 1987.[1] The appellants assert that because bass tournaments on a public waterway operated without appropriate safety requirements present an unreasonable danger to the public, OMC, as a sponsor and encourager of FAA's tournament, should be held liable for any injuries resulting from the tournament.

The appellants expended much effort proving that participants in bass tournaments operate their boats at maximum speeds during a tournament. Boaters, however, often operate their boats at top speeds on the lake when not participating in bass tournaments. The lake did not have a speed limit outside of "no-wake zones." McCullough testified that he drove his boat no faster during the tournament than he typically did "on a regular weekend." The boaters did not use racing boats; they used stock bass boats with motors sized to match the boats. We reject, without more, the appellants' contentions concerning the dangers of bass tournaments.

More significant was the appellants' failure to establish that OMC's providing prizes made the contest more dangerous. The appellants asserted that OMC's providing entic-

---

1. The article's photocopy appearing in the record did not report the page number.

ing prizes motivated the contestants to drive faster, but the record belies that. The record establishes that McCullough drove at the speed he always did when he went fishing. Moreover, the contestants had a right, in the absence of a speed limit, to run their boats at maximum speed. Assuming that OMC prizes motivated the contestants to run fast, it was a motivation for the contestants to do what they had a lawful right to do.

Moreover, the appellants failed to link the cause of the crash to the contest. To make a case of negligence, the appellants were obligated to establish that some act or omission by OMC was the natural and probable cause of the crash. *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 865 (Mo. banc 1993). We have already established that OMC's offering prizes did not cause the crash. · The appellants argue, however, that OMC could have, but failed, to require FAA to put a speed limit on its contestants. To accomplish this, OMC would have had to have been in a position of authoritative control which, under the law, would render OMC vicariously liable.

Endeavoring to show this control, the appellants first claim that OMC and FAA had a master-servant relationship which rendered OMC vicariously liable under the doctrine of *respondeat superior.* They argue that OMC exerted sufficient control over FAA and Word to at least establish a genuine issue of whether OMC was FAA's and Word's master. They note that OMC demanded that FAA prominently display OMC's product logos at the tournaments; that OMC expected Word to wear clothing bearing OMC's product logos; that OMC demanded that Word report to it after each tournament what outboard motors tournament participants used; and that OMC demanded that Word and FAA implement three safety regulations as a condition of OMC's sponsorship. These safety requirements were that each participant wear a personal flotation device, have a special switch which would turn off their outboard motors in an emergency, and that the motors on the participants' boats be certified as the correct size for their boats.

This did not establish a master-servant relationship as a matter of law. The test for such a relationship is whether the person sought to be charged as master has the right or power to control and direct the physical conduct of the other. *Wilson v. St. Louis Area Council, Boy Scouts of America*, 845 S.W.2d 568, 570 (Mo.App.1992). The control of the alleged master must be complete and unqualified. It must be authoritative control which includes the details of how the work is performed. For OMC to be deemed FAA's or Word's master, it would have had to have the authority to control the manner, method, and means for FAA's and Word's performance. *Id.* at 571. OMC did not have such authority.

The appellants cannot show that OMC had authority to control FAA or Word. They do show that OMC was able to influence the contest by requiring implementation of certain safety requirements and were able to require FAA and Word to do certain acts such as displaying logos and reporting results. The undisputed evidence establishes that OMC exerted this influence, not pursuant to a right to control, but by negotiation and persuasion. OMC would not have been able to exert its influence had FAA and Word, as autonomous and independent entities, chosen to resist. Only FAA and Word had the authority to command the tournament. Word selected the tournament sites, their rules and details.

OMC did not authorize the FAA fishing tournament; nor did it supervise or direct Word's actions in running the tournament the day of the accident. An OMC official testified in his deposition that he left it to Word to run the bass fishing tournaments. Word repeatedly admitted that OMC did not have any say in the way the tournaments were run. Word and FAA did not act as OMC's servants or agents.

The appellants next contend that the tournaments were a joint venture of OMC and FAA. We disagree. For the tournaments to have constituted a joint venture, OMC and FAA would necessarily have had equal voices in directing the meets. *McSorley v. Hauck*, 883 S.W.2d 562, 566 (Mo.App. 1994). They did not. Although OMC directed the use of its logos and demanded minimal safety requirements, it did not have any voice in the remaining, and more significant, tournament details.

The appellants cited several cases to support their position. They principally relied on *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975), to argue that anyone sponsoring a contest which involves speed and occurs in a public context is liable for injuries to the public. In that case, a radio station offered money to the first contestant to find a disc jockey who was driving on the public streets of Los Angeles. Racing to locate the disc jockey, two of the contestants caused an accident which killed a driver who was not participating in the contest. In a lawsuit filed by the decedent's family against the radio station, the court found that "[t]he risk of a high speed automobile chase is the risk of death or serious injury," and thus, the accident was foreseeable. *Id.* 123 Cal.Rptr. at 479–80, 539 P.2d at 47–48. It also found that the radio station could have prevented injury by adopting a different contest format. *Id.* at 480, 539 P.2d at 48.

In light of *Callahan*, 863 S.W.2d at 865, we question the legal analysis in *Weirum*. Even if we were to concur, however, we would distinguish *Weirum* on a factual basis. Unlike the appellants' case, the contest sponsor in *Weirum* determined the contest format and rules, and physically ran the contest. The duty in *Weirum* arose because the accident was foreseeable and the radio station, in a position to control the contest, could have protected against its occurrence.[2]

Hence, because we fail to discern sufficient control, as a matter of law, over the tournament to render OMC liable, and because we conclude that OMC's sponsorship of the tournament was not the proximate cause of the fatal crash or a breach of duty to the crash victims, we affirm the circuit court's granting OMC's motion for summary judgment.

All concur.

---

**2.** Likewise, other cases appellants cite, including *F.W. Woolworth v. Kirby*, 293 Ala. 248, 302 So.2d 67 (1974), *Shafer v. Keeley Ice Cream Co.*, 65 Utah 46, 234 P. 300 (1925), *Cummings v. General Motors Corp.*, 146 Conn. 443, 151 A.2d 884 (1959), *Macon Telegraph Pub. Co. v. Graden*, 79 Ga.App. 230, 53 S.E.2d 371 (1949) and *Michel v. O'Connor*, 26 Ill.App.2d 255, 167 N.E.2d 694 (1960), all involve sponsors who were responsible for the organization or format of the event.