No. 76,618

BARBARA GRAGG, *et al., Appellants,* v. WICHITA STATE
UNIVERSITY, *et al., Appellees.*

934 P.2d 121

Opinion filed March 14, 1997.

*Charles T. Engel,* of Cosgrove, Webb & Oman, of Topeka, argued the cause, and *John T. Houston,* of the same firm, was with him on the briefs for appellants.

*Jeff C. Spahn, Jr.,* argued the cause, and *Michael G. Jones,* of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, were on the brief for appellees Wichita State University and Wichita State University Intercollegiate Athletic Association, Inc.

*John C. Nettels, Jr.,* of Morrison & Hecker, L.L.P., of Wichita, argued the cause for the remaining appellees, and *Dwight D. Dumler,* of the same firm, was with him on the brief for appellee Cessna Aircraft Company.

*M. Duane Coyle,* of Wallace, Saunders, Austin, Brown, & Enochs, Chartered, of Wichita, was on the briefs for appellee Blockbuster Entertainment Corp.

*William Tinker, Jr., Sharon A. Werner,* and *Alisa M. Arst,* of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, were on the brief for appellee TB of America, Inc., Taco Bell Corp., and New West Radio, Inc., formerly d/b/a KNSS Radio and/or KRZZ Radio.

*J. Michael Kennalley*, of Hershberger, Patterson, Jones & Roth, L.C., of Wichita, was on the brief for appellee Major Video of Kansas, Inc.

*William P. Tretbar*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, was on the brief for appellee Chronicle Publishing Company d/b/a KAKE-TV.

*Bryan W. Smith*, of Fisher, Cavanaugh & Smith, P.A., of Topeka, was on the brief for *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

LARSON, J.: This is a wrongful death and survival action brought by the heirs of Barbara Gragg, who was shot and killed by Anthony Scott at the Celebrate '93 fireworks display held on the campus of Wichita State University (WSU). The defendants are WSU, its athletic corporation, and the corporate sponsors of the event. The Gragg children claimed the defendants failed to provide adequate security for the event, failed to install adequate lighting on the campus, and failed to warn of the potential for crime on or near the campus.

The trial court granted the defendants summary judgment on the grounds they owed no legal duty to protect Gragg from or warn her of the criminal acts of a third party and the Kansas Tort Claims Act (KCTA) provides immunity to all the defendants from the plaintiffs' claims.

*Statement of facts.*

The trial court essentially accepted, while recognizing that some statements were conclusory, the Graggs' statement of uncontroverted facts for the purpose of ruling on the summary judgment motion. The defendants' statements of the uncontroverted facts, except those few disputed by the Graggs, were also accepted.

These facts were essentially the following:

An Independence Day program of "Celebrate" has been held annually in Cessna Stadium on the WSU campus from 1976 through 1993, with the exception of 1990, when it was held elsewhere due to the condition of the Cessna Stadium bleachers. Celebrate was considered a community event to benefit the people of Wichita and its goal was to create an atmosphere of celebration on the Fourth of July.

The cost of the Celebrate programs has been underwritten by local corporate sponsors, which have varied from year to year, with only KAKE-TV having been a sponsor since inception. The sponsors of Celebrate '93 were Chronicle Broadcasting Co. d/b/a KAKE-TV, New West Radio, Inc. d/b/a KRZZ/KNSS Radio, T B of America, Inc., Taco Bell Corp., Blockbuster Entertainment Corp., Major Video of Kansas, Inc., and Cessna Aircraft Co. The sponsors helped select "hometown heroes" for the event; provided television and radio coverage or made financial payments; and helped the committee design Celebrate '93 items such as T-shirts, signs, and letterheads. The retail business sponsors sold admittance buttons.

Celebrate '93 was primarily produced by a coordinating committee which met numerous times prior to the event. Amy Schafer, the WSU Director of Community Relations and Special Events, served as executive producer of Celebrate '93. She prepared the coordinating committee and public safety committee agendas and minutes, put together a security manual, and had general supervision and control over the event. Each sponsor assigned one or more individuals to the Celebrate '93 coordinating committee. None of the sponsors or the coordinating committee members were paid for their services, with the exception of Schafer, who received $400 from Celebrate '93.

The coordinating committee's duties were to plan, promote, and produce Celebrate '93 and to approve its budget. Security was discussed at most meetings, and a public safety subcommittee met to discuss a wide range of security issues on June 22, 1993. Captain John Davis, a salaried employee of the WSU police department (WSUPD), has been involved in the security of all prior Celebrate events. Captain Davis prepared the security plan for Celebrate '93, developed the security arrangements, and made a report at each coordinating committee meeting. Captain Davis' plan had remained virtually unchanged for the past 10 Celebrate events.

The coordinating committee received and reviewed the Celebrate '93 security plan. No suggestions relating thereto were made, although the use of mounted officers at the event had been a suggestion from members of a prior coordinating committee. While

members of the committee could voice opinions regarding any subject, the sponsors believed they had no authority to tell the WSUPD how to handle security for Celebrate '93.

WSU's president granted authority to use Cessna Stadium and for skydivers to land on the campus. Celebrate '93 did not lease the stadium or any of the surrounding university property. Numerous employees of WSU and its affiliate, the Wichita State University Intercollegiate Athletic Association, Inc. (WSUIAAI), participated in planning and producing the event, but no cash funds were provided by WSU. Various WSU departments billed Celebrate '93 for supplies or services. Funds for Celebrate '93 were held in a special account maintained by the WSU Board of Trustees. All bills for Celebrate '93 were forwarded to the WSU public relations office and were paid from this account after Schafer submitted them to the WSU Board of Trustees. Celebrate '93 security officers were paid from this account. Captain Davis was paid for 36 hours of work.

The Celebrate '93 account had a beginning balance of $9,835.83. The planned budget for Celebrate '93 projected a balance after the event of $16,336.90; this included an extra $17,500 in sponsor donations and $11,600 in button sales than were actually received. Celebrate '93 was not registered in Kansas as a corporation and paid no income taxes. Checks from sponsors were made payable to Celebrate '93 and numerous invoices listed the purchaser as Celebrate '93. Celebrate '93 paid sales tax on items it purchased. Celebrate '93 ended up with a budget deficit, and four of the sponsors, but not WSU, each contributed $1,792.97 in order for the event to break even.

Celebrate '93 was open to the public. To gain admission to the stadium, it was necessary to purchase a button; however, the public could watch the fireworks display from the WSU campus at no charge. The coordinating committee obtained permission from the Wichita City Council to close off part of a street adjoining Cessna Stadium. About 19,819 admittance buttons were sold to the public.

The WSUPD is the statutorily recognized police department serving the WSU campus. However, the Wichita Police Department (WPD) also has jurisdiction over the campus. Security for

Celebrate '93 was a cooperative effort between the WSUPD and the WPD, yet Captain Davis was in charge of the overall security of Celebrate '93. The planned security force for the event included over 80 commissioned and noncommissioned WSUPD officers and off-duty WPD officers, plus WPD traffic section officers and Sentinel Patrol private security officers, 27 WPD reserve officers, and 6 horse mounted officers. Sentinel Patrol officers were assigned to the gates to check coolers for alcoholic beverages. The WPD reserve officers worked in conjunction with the WPD traffic division to control traffic and patrol the parking lots.

A supervisors' meeting was conducted at 6 p.m. in which assignment sheets were passed out. The WSUPD and WPD off-duty officers assembled at a 6:30 p.m. meeting and were given their assignments. The reserve officers were also given specific instructions regarding their assignments. Not all of the officers signed the sign-in sheet, and Sentinel Patrol officers left before the display ended. No records indicated whether the remaining security personnel actually stayed until midnight.

Anthony Scott, a member of the Insane Crips gang, had been the victim of three different drive-by shootings in 1993. Scott came to Celebrate '93 looking for members of the Junior Boys gang he thought were responsible for shooting him.

Barbara Gragg had purchased an admission button to Celebrate '93. The fireworks display began at 10 p.m. and lasted for 15 to 17 minutes. When the display began, the lights in the stadium were turned off, although the lights on the rest of the campus remained on. The lights were turned back on in the stadium after the fireworks display was over. After the display, Gragg left the stadium and was walking beside Anthony Robinson through the dark grassy field on campus south of Henry Levitt Arena, which was formerly a football practice area. Scott shot and killed Gragg and Robinson while they were walking through the grassy field. After hearing gunfire, two mounted officers 75 yards away were the first to respond. Scott was apprehended near the scene and later convicted of murdering both Gragg and Robinson. To the plaintiffs' knowledge, neither Captain Davis, Schafer, any coordinating committee member, nor any other police or security officers knew that Scott

was on campus with a weapon or that gang members intended to commit violence on the campus.

Other than the July 4, 1993, shooting, no shootings or violent assaults have occurred during or after a Celebrate event. On September 2, 1991, Anthony Jones was shot and killed in a parking lot at the Black Arts Festival held on another area of the WSU campus. No other shootings or violent assaults resulting in death have occurred at a public event on the WSU campus since 1968.

Captain Davis was aware that gang activity has occurred within a half mile of the campus and that crime incidents were higher in the area west of campus. A vice-president at WSU stated that WSU's enrollment decreased in 1991 due to violent crime and gangs in the area. Concerns about security, walking through the area west of Hillside, and fears that gangs could be a problem were discussed at the Celebrate '93 public safety subcommittee meeting.

Barbara Gragg's three children sued WSU, all the sponsors, and many individuals, alleging that under the totality of the circumstances reasonable security was not provided, the area was inadequately lighted and guarded, and Gragg had not been warned of crime in the surrounding area. Numerous individual defendants, including all of the sponsors' representatives serving on the coordinating committee, Schafer, Davis, the City of Wichita, and the city council members have been dismissed. At this point, only the sponsors of Celebrate '93, WSU and its affiliate, WSUIAAI, remain as defendants.

After WSU, WSUIAAI, and the sponsors were granted summary judgment on the grounds that they owed no duty to Gragg and that the KTCA provided immunity, the plaintiffs appealed. We have jurisdiction pursuant to K.S.A. 20-3018(c).

*Scope of Review*

This case comes to us after grants of summary judgment on behalf of all of the defendants. Before we consider the questions raised as to the nature and extent of the duty owed to Barbara Gragg and the foreseeability of the tragic acts which befell her or the exemptions from liability which are statutorily available, we first

set forth the basic rules relating to the granting and review of summary judgments under which we operate.

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." K.S.A. 60-256(c).

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case." *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260, 891 P.2d 435 (1995).

On appeal, we are required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom summary judgment was entered. *McGee v. Chalfant*, 248 Kan. 434, 437, 806 P.2d 980 (1991). Where reasonable minds could differ as to the conclusions to be drawn from the evidence, summary judgment should be denied. However, in *McGee*, we also noted: "The existence of a legal duty is a question of law to be determined by the court." 248 Kan. at 437. We have unlimited review of questions of law. *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 716, 924 P.2d 1239 (1996).

*The defendants did not owe a legal duty to Barbara Gragg to protect her from the criminal act of an unknown third party.*

We first address the issue of the relationship and the existence of a legal duty of the various named defendants to Gragg to warn her of the potential danger and to protect her from the criminal acts of Scott. In *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983), this court said:

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. [Citation omitted.] An accident which is not reasonable to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence ac-

tion. . . . *Robertson v. City of Topeka*, 231 Kan. 358, recognized a special relationship between certain persons could give rise to a duty. *Whether a duty exists is a question of law* [Citations omitted.]. Whether the duty has been breached is a question of fact." (Emphasis added.)

It is our generally recognized rule in Kansas that in the absence of a "special relationship" there is no duty on a person to control the conduct of a third person to prevent harm to others. "A special relationship may exist between parent and child, master and servant, the possessor of land and licensees." *C.J.W. v. State*, 253 Kan. 1, 8, 853 P.2d 4 (1993).

The Graggs argue that the required special relationship exists between a possessor of land and licensee or invitees, relying on Restatement (Second) of Torts §§ 316-320 (1964). The specific provision of the Restatement in issue is § 318, "Duty of Possessor of Land or Chattels to Control Conduct of Licensee," which states:

"If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

(a) knows or has reason to know that he has the ability to control the third person, and

(b) knows or should know of the necessity and opportunity for exercising such control."

The reporter's notes to § 318 provide in comment *b*:

"The rule stated in this Section is applicable where the possessor of a chattel or of land is present when the chattel is being used or the activity is being carried on with his permission, and when, therefore, he has not only the ability to control the conduct of the third person as possessor, but also the opportunity to do so."

In the circumstances of this case, it is uncontroverted that none of the defendants had any knowledge of Scott's intentions or even that it was likely that he or someone like him would present an unreasonable risk to the participants in Celebrate '93. Thus, as the defendants lacked sufficient knowledge to control Scott's actions, § 318 does not appear to apply.

Although not specifically argued by the Graggs, an earlier provision of the Restatement (Second) of Torts § 314A (1964) sets

forth the basis for the existence of a special relationship in cases involving a possessor of land. It states:

> "Special Relations Giving Rise to Duty to Aid or Protect
>
> "(1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm, and
>
> . . . .
>
> "(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation."

The reporter's notes to § 314A contain statements of the drafters as to the provisions in issue. Comment *e* explains:

> "The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk . . . . He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate."

This provision of the Restatement appears to relate directly to a party who is deemed to be a "possessor of land."

Additionally, Restatement (Second) of Torts § 344 (1964), which is entitled "Business Premises Open to Public: Acts of Third Persons or Animals," provides:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> "(a) discover that such acts are being done or are likely to be done, or
>
> "(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

The comments give an explanation of the section:

> "f. *Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual."

Again, this provision is directed to the party who is the possessor of land.

Had this claim not involved the criminal acts of an unknown party, our recent rule of *Jones v. Hansen*, 254 Kan. 499, 867 P.2d 303 (1994) (ignoring the prospective nature of such ruling), would teach us that the duty owed by the possessor of land to invitees and licensees alike is one of reasonable care under all the circumstances.

*Jones* further instructs:

"Included in the factors to be considered in determining whether, in the maintenance of his or her property, the land occupier exercises reasonable care under all the circumstances are foreseeability of harm to the plaintiff entrant, the magnitude of the risk of injury to others in maintaining such a condition on the premises, the individual and social benefit of maintaining such a condition, and the burden upon the land occupier and/or community, in terms of inconvenience or cost, in providing adequate protection." 254 Kan. 499, Syl. ¶ 3.

Although Gragg clearly was an invitee on the WSU campus, the provisions we have cited raise the larger and wider question of whether the sponsors, by their involvement in Celebrate '93, also became "owners, occupiers, or possessors of the premises" so that any relationship Gragg enjoyed with WSU could be extended to them. For all of the reasons we hereafter state, we hold that none of the sponsors had control of or were owners, occupiers, or possessors of the premises and that no duty that might exist as to WSU may be extended to any of the sponsors.

The Graggs attempt to burden the sponsors with the requisite duty by three distinct, yet closely related, theories. First, they argue the sponsors, through their participation in Celebrate '93, became occupiers and possessors of the WSU campus and thus owed a duty to Gragg as an invitee. Second, the Graggs claim all of the sponsors and WSU had entered into a joint venture to produce Celebrate '93 and through it owed a duty to Gragg. Finally, the Graggs suggest that by their representation on the Celebrate '93 coordinating committee, the sponsors had sufficient control to become possessors of the land.

In *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 41-42, 815 P.2d 506 (1991), Justice Six, writing for the court stated:

"To hold a defendant liable for failure to keep premises in a reasonably safe condition, the defendant must be the owner, occupier, or possessor of the prem-

ises. *Summers v. Montgomery Elevator Co.*, 243 Kan. 393, 400, 757 P.2d 1255 (1988); *Hall v. Quivira Square Development Co.*, 9 Kan. App. 2d 243, 244, 675 P.2d 931, *rev. denied* 235 Kan. 1041 (1984).

"Restatement (Second) of Torts § 328E (1964) defines a 'possessor of land,' in part, as: one who is in occupation of the land with the intent to control it. In determining the liability of a possessor of land, we have applied the occupation with intent to control principle. *Summers*, 243 Kan. at 400; *Hall*, 9 Kan. App. 2d at 244."

This statement is consistent with the Restatement definition of "duty," which makes clear that no duty exists if the actor has no right of control over the condition causing the injury. Restatement (Second) of Torts § 4, Comment *a* (1965) states:

"The duty which is defined in this Section is a duty that the actor shall conduct himself or not conduct himself in a particular manner. It therefore imposes no obligation which is not within the actor's ability to perform, since it relates only to the actor's conduct over which as such he has no control."

Several recent Kansas cases in addition to *Miller* have expanded on the holding of lack of liability unless one is the owner, occupier, or in control as the possessor of the premises. In *Rogers v. Omega Concrete Systems, Inc.*, 20 Kan. App. 1, 883 P.2d 1204 (1994), summary judgment was deemed proper in a premises liability case where there was no evidence that Omega controlled the premises. This case was based on the condition of the premises and not on the criminal acts of some unknown or unexpected party, but in discussing the requirement that before a duty exists or liability could be predicated in a premises liability case, the Court of Appeals quoted 62 Am. Jur. 2d, Premises Liability § 6, p. 353, which provides:

" '*Occupation, or possession, and control* is usually one of the attributes that must be shown as a basis for liability on the part of an owner or occupant of premises for injuries resulting from the condition of the premises. The liability of an occupant of real estate for injuries caused by a dangerous or defective condition of the premises depends generally upon his control of the property, whether or not he has title thereto and whether or not he has a superior right to possession of property which is in the possession and control of another.' (Emphasis added.)" 20 Kan. App. 2d at 5.

The *Rogers* opinion goes on to hold:

"Omega did not own any of the real estate on which the private road and crossing were located. The issue presented is one of control, not ownership. In a premises liability case, in order to be liable, the party charged must have had control over the premises in question. It is obvious that, without control, the responsibility for the dangerous or hazardous condition cannot exist. To put it another way, a party may not be held responsible for a condition which he or she did not cause and which he or she has no ability to remedy." 20 Kan. App. 2d at 5.

In *Fountain v. Se-Kan Asphalt Services, Inc.*, 17 Kan. App. 2d 323, 332-33, 837 P.2d 835, *rev. denied* 251 Kan. 937 (1992), the court found that the defendant road contractor owed no duty to the plaintiff to keep a county road free from dust which contributed to a head-on collision. The court held that the duty to maintain county roads was statutorily imposed on the county so that the contractor could have no control over the road.

In *Hall v. Quivira Square Development Co.*, 9 Kan. App. 2d 243, 244, 675 P.2d 931, *rev. denied* 235 Kan. 1041 (1984), it was determined that absent any showing of control over the common area of a mall, a store owner was not liable for an accident in the parking lot.

The facts regarding the involvement of each of the sponsors in Celebrate '93 are not in dispute. All each sponsor did was contribute a sum of money or provide some service and send a representative to the coordinating committee chaired by Schafer, a WSU employee, who had general supervision and control over the event. Aside from the benefits of being advertised as a sponsor of a public event, no sponsor received any payment from Celebrate '93 or expected to share in any profit from the event.

The WSU campus was not leased to Celebrate '93 or to any sponsor. The authority to approve events and the responsibility for preparing the campus remained in WSU. There is absolutely no evidence that any sponsors or their representatives had the authority to direct Captain Davis how to provide security on the premises.

There is no genuine issue of any material fact showing that any of the sponsors became an occupier or possessor of the WSU campus or that any of them either controlled or intended to control

the premises so that the duty which the Graggs attempted to place upon them could come into existence under a theory of premises liability.

Additionally, none of the sponsors possessed any "superior knowledge" of the premises, see *Little v. Butner*, 186 Kan. 75, 80, 348 P.2d 1022 (1960), or had any ability to remedy a danger which they had not caused and did not know existed, see *Rogers*, 20 Kan. App. 2d at 5. All of the facts about law enforcement and criminal activity on the WSU campus as well as surrounding areas were best known to Captain Davis and the WSUPD, as well as the WPD. It is clear no sponsor had the authority to implement different security measures for Celebrate '93, even if it had disagreed with the measures that the WSUPD was taking.

The Graggs' argument that the sponsors and WSU had entered into a joint venture allowing a claimed duty on WSU's part to be imputed to the sponsors must also fail. The Graggs contend that because the preliminary budget projected a surplus, Celebrate '93 was in fact intended to be a profitable business venture. They argue the funneling of all money into a single account and the payment of all expenses therefrom, coupled with Celebrate '93 not being incorporated or a recognized nonprofit organization, must make it a joint business venture in which liability is imputed to all the sponsors.

To prove vicarious liability based on a joint venture, four basic elements must be established: "(1) an agreement; (2) a common purpose; (3) a community of interest; and (4) an equal right to a voice accompanied by an equal right of control over the instrumentality." *Pizel v. Zuspann*, 247 Kan. 54, 70-71, 795 P.2d 42, *modified* 247 Kan. 699, 803 P.2d 205 (1990); *Scott v. McGaugh*, 211 Kan. 323, 327, 506 P.2d 1155 (1973).

For the purposes of their summary judgment motion, the sponsors focused only on the fourth element, the equal right of control over the instrumentality alleged to have caused the harm. This, once again, is essentially the right to control security, which we have previously discussed in detail and held clearly fell directly on Captain Davis and the WSUPD.

Although there was input in a committee, the facts clearly showed that security was and had been at all of the previous Celebrate events under the direct supervision and control of Captain Davis and the WSUPD. There are absolutely no material facts suggesting the sponsors could control or even have an equal voice in the control over the conditions the Graggs claim allowed Scott to commit the murder: inadequate lighting and insufficient security.

The sponsors provided money or services and the assistance of employees. Nothing more. WSU provided the chair for the committee, who was its overall leader and director. WSU remained in control of the activities and the event which took place on its campus. More importantly, the WSUPD provided the manpower plus the leadership over the manner and method of providing police protection. Captain Davis unequivocally stated the sponsors had no authority over, as well as no right to direct, the WSUPD's handling of security for Celebrate '93. As a matter of law, the sponsors and WSU were not engaged in a joint venture so that any of the sponsors could be considered in control of security, or the WSU campus lighting, or be found vicariously liable for any other party's action.

Finally, no liability exists simply because one is a sponsor of a public event, absent some proof the sponsor had direct control over hazardous conditions. Kansas has no cases directly in point, but similar issues have been litigated in other states.

In *Archer v. Outboard Marine Corp.*, 908 S.W.2d 701 (Mo. App. 1995), OMC was one of 19 sponsors of a bass fishing tournament who were sued by the family of a man killed after he was struck by a tournament participant's speeding boat. Even though OMC's logo was displayed (as were the sponsors here), the court held the sponsorship and promotional value of the tournament were not enough to establish any right of control. The Missouri Court of Appeals additionally rejected a claim of joint venture, finding no equal voice by OMC in directing the tournament.

In *Vogel v. West Mountain Corp.*, 97 App. Div. 2d 46, 470 N.Y.S.2d 475 (1983), the court ruled that the sponsor of a skiing event was not liable for injuries sustained by a participant where the sponsor did not supervise the running of the event.

In another case decided under New York law, *Gehling v. St. George's Univ. School of Medicine*, 705 F. Supp. 761 (E.D.N.Y. 1989), the court held that a medical school which sponsored a road race in Grenada had no special duty to one of the runners merely because it contributed funds and allowed students to organize the event partly held on its property. The court declared: "There is a distinction between sponsoring an event and being responsible for any actions which take place." 705 F. Supp. at 765.

Another example is *Calogrides v. City of Mobile*, 475 So. 2d 560 (Ala. 1985), where the plaintiff sued the city, one of the sponsors of a Fourth of July fireworks celebration, for injuries suffered at the event. The city was granted summary judgment based on a holding there was no duty that could support plaintiff's cause of action.

Although the Celebrate '93 sponsors may have been involved differently than in the cases cited, there is no evidence the sponsors here took control away from or even shared control with WSU so as to give rise to any control over the celebration.

While this opinion has primarily discussed the Graggs' claim that security measures were unreasonable under the totality of the circumstances, it is equally true that no facts were shown that would indicate any of the sponsors had the ability to control the lighting situation on the campus or to post warnings on the campus or in the advertising. Before any additional lighting could have been installed, WSU's permission would have been required, again indicating the lack of sponsor control. It is further clear that none of the sponsors possessed any special knowledge regarding crime in the area that was not publicly known such that they would have had a duty to warn the public in general.

Based on all of these considerations, we hold the trial court correctly decided none of the sponsors were possessors of the premises or had violated any duty to Gragg. Summary judgment was properly granted to all of the sponsors.

Having held that summary judgment was properly granted to the sponsors because none controlled or possessed the premises where Gragg was killed does not conclude our discussion of whether a sufficient special relationship exists creating a duty to

Gragg by WSU. WSU *was* in control of and *was* the possessor of the premises at Celebrate '93. This places WSU in a different and separate category from the sponsors. However, just because WSU was the owner of and in control of the property where Gragg was killed does not automatically establish that WSU owed a duty to Gragg to prevent the shooting.

The Graggs seek to place WSU in the shoes of the landowners in two recent Kansas cases involving damages from third parties' acts, *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993), and *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 856 P.2d 1332 (1993), where summary judgments in the owners' favor were reversed. Both cases have significant differences from our situation, but similarities exist which require we discuss each in considerable detail.

*Nero* was an action against KSU for damages arising out of a sexual assault which occurred in housing furnished by the university for its students. We held KSU had a legal duty to use reasonable care under the circumstances to protect the occupants of a coed housing unit from foreseeable criminal conduct in a common area. KSU was denied summary judgment because it knew of the attacker's history of sexual assault, but proceeded to place him in the dormitory with the victim without warning the occupants.

It is not necessary for us to restate here what was well said in *Nero* about the application of Restatement (Second) of Torts §§ 315-320 (1964), which is fully set forth at 253 Kan. at 571-582. *Nero's* holding, however, is more basically represented as follows:

"KSU is a landlord furnishing housing to its students in competition with private landlords. It owes a duty of reasonable care to its tenants. KSU has discretion whether to furnish housing to students. Once that discretionary decision is made, the university has a duty to use reasonable care to protect its tenants. Generally, whether a landlord has breached the duty of reasonable care to a tenant is a question of fact.

" 'Whether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law. [Citation omitted.]' *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 362, 819 P.2d 587 (1991)." 253 Kan. at 583.

After reciting Restatement (Second) of Torts § 344 (1964) and the specific facts by which KSU had placed the victim in the same coed dormitory with the attacker, who had a pending rape charge, we concluded in *Nero*: "We are of the opinion reasonable people would disagree whether Davenport's attack on Nero was foreseeable. Thus, that issue must be resolved by the trier of facts, and the trial court erred in granting summary judgment." 253 Kan. at 585.

The facts of *Nero* differ greatly from our situation. Scott was totally unknown to WSU or its law enforcement officers. Our case is not a landlord-tenant situation where control could have been exercised over a known attacker in the proximity to protect an unknowing victim. *Nero* is sufficiently factually different such that it is not persuasive authority to overturn the grant of summary judgment to all of the parties in this case.

In *Seibert*, 253 Kan. 540, a woman was shot in the parking lot of a shopping center during an armed robbery attempt by an unknown assailant. The victim sought to impose liability on the owner of the shopping center for failing to provide security for the area. We decided:

"In determining whether there is a duty owed, we start with two general rules. The owner of a business is not the insurer of the safety of its patrons or customers. The owner ordinarily has no liability for injuries inflicted upon patrons or customers by the criminal acts of third parties in the business' parking lot, as the owner has no duty to provide security. Such a duty may arise, however, where circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken." 253 Kan. at 548.

We went on to hold:

"The test for determining the foreseeability requirement for injuries to customers by the criminal acts of third parties occurring in a business' parking lot is determined to be the 'totality of the circumstances' rule as opposed to the more restrictive 'prior similar incidents' rule." 253 Kan. 540, Syl. ¶ 4.

In adopting the totality of the circumstances rule for determining foreseeability in *Seibert*, we said:

"The circumstances to be considered must, however, have a direct relationship to the harm incurred in regard to foreseeability. Prior incidents remain perhaps the

most significant factor, but the precise area of the parking lot is not the only area which must be considered. If the parking lot is located in a known high crime area, that factor should be considered. For instance, one should not be able to open an all-night, poorly lit parking lot in a dangerous high crime area of an inner city with no security and have no legal foreseeability until after a substantial number of one's own patrons have fallen victim to violent crimes. Criminal activity in such circumstances is not only foreseeable but virtually inevitable.

". . . It is only where the frequency and severity of criminal conduct substantially exceed the norm or where the totality of the circumstances indicates the risk is foreseeably high that a duty should be placed upon the owner of the premises to provide security. The duty to provide security is determined under the reasonable person standard. Thus, the duty to provide security and the level of such security must be reasonable—that includes the economic feasibility of the level of security. . . . The shopping center owner is not under a duty to provide such security as will prevent attacks on the patrons—such a duty would make the owner the insurer of his patrons' safety. Rather, if because of the totality of the circumstances the owner has a duty to take security precautions by virtue of the foreseeability of criminal conduct, such security measures must also be reasonable under the totality of the circumstances. Such an approach is consistent with the Restatement (Second) of Torts § 344 (1965)." 253 Kan. at 549-50.

Although *Beck v. Kansas Adult Authority*, 241 Kan. 13, 735 P.2d 222 (1987), was not decided on a totality of the circumstances standard, the fact situation there has similarities to our case. In *Beck*, the negligent acts complained of were the failure to provide more adequate police protection and the failure to warn. We affirmed the dismissal of all of the defendants where a former psychiatric patient walked into the emergency room at the University of Kansas Medical Center and opened fire with a shotgun, killing a doctor and a family member of a patient.

We held in *Beck* there was no duty to warn despite the fact the assailant had assaulted medical center personnel some years earlier. We emphasized that none of the defendants had taken custody or control over the assailant and the duty to warn found in *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984) (failure to warn law enforcement officers of prison escape), did not exist in *Beck*. Although the Beck petition alleged the event was foreseeable, foreseeability was not discussed in detail in the *Beck* opinion and the dismissal was entered based upon the police protection exception of the KTCA, then K.S.A. 75-6104(m) (Ensley 1984).

In our discussion of foreseeability, it is instructive to look at *Cupples v. State*, 18 Kan. App. 2d 864, 861 P.2d 1360 (1993), where a prison official or governmental unit was found to have no liability in the absence of knowledge of the danger of an assault or reason to anticipate such danger. Although the special relationship of a correctional institution to a prisoner was found to exist, the attack on which Cupples claimed liability came from a totally unexpected and completely unanticipated source. In discussing foreseeability, the *Cupples* opinion stated:

"In the final analysis, our decision may also be based on the fact the injury to Cupples was not foreseeable by the defendants. Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. *Upson v. Goodland State Bank & Trust Co.*, 797 P.2d 845, 848 (Colo. App. 1990). An injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm. *Huston v. Konieczny*, 52 Ohio St. 3d 214, 217, 556 N.E.2d 505 (1990).

"Foreseeability is extensively discussed in the recent opinion of *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993). *Nero* is clearly factually different from our case, as it holds that a state university owes student tenants the same duty to exercise due care for their protection as a private landowner owes to its tenants. . . . There is no factual basis in our case for finding it foreseeable that Young would attack Cupples. This is the only conclusion which reasonable persons would reach.

. . . .

"There is no factual basis for finding the State owed Cupples the duty to protect her from Young, and, where no specific duty is owed, the State is required only to exercise reasonable and ordinary care to prevent attacks by other inmates. *Washington*, 17 Kan. App. 2d at 523. No breach of duty occurred because there was no way the defendants knew or should have known the danger existed.

"We hold, as a matter of law, that Cupples has failed to show that a special duty existed on the part of the defendants to protect her from an unanticipated and unexpected attack by Young. We also hold it was not foreseeable under the circumstances that Young would attack Cupples." 18 Kan. App. 2d at 879-80.

Under the facts of our case, the only similar incident shown to have occurred was a shooting at a Black Arts Festival held on another part of the campus almost 2 years prior to the shooting of Barbara Gragg. It is undisputed there had been no similar attacks or incidents at any of the 17 previous Celebrate events.

The Graggs point to the high crime rate in the neighborhoods surrounding WSU and claim this resulted in a decline in WSU's enrollment in 1991, but no facts show that the crime level posed a security problem for Celebrate '91 or '92 such that those in charge of security for Celebrate '93 should have been placed on notice that greater security measures were needed. The facts indicate that well over 100 WSUPD officers, WPD off-duty and reserve officers, and private security officers were utilized for the event.

Clearly, no one participating in the production of Celebrate '93 or law enforcement personnel had any prior knowledge that Scott intended to shoot anyone on the WSU campus. No undisputed facts exist that would justify a finding that it was foreseeable that Scott would shoot Gragg.

We are instructed by *Seibert* to pose the question in the following manner: Was the attack upon Gragg foreseeable under the totality of the circumstances so that WSU should be charged with a legal duty to provide greater security for Celebrate '93 than it had been providing for the past 10 years? If we examine the question in this manner, the only conclusion which reasonable persons would reach is that the security and lighting were adequate and it was not foreseeable that Scott would come onto the WSU campus and shoot Gragg.

We hold, as the trial court did, that as a matter of law, the Graggs have failed to show a special duty existed on the part of WSU to protect Gragg from the unanticipated and unexpected attack by Scott. We also decide, as a matter of law, that it was not foreseeable under the totality of the circumstances that Scott would shoot Gragg.

*The police protection exception of the Kansas Tort Claims Act, K.S.A. 75-6101 et seq., provides WSU and WSUIAAI immunity from liability.*

We have set forth above sufficient reasoning to justify the grant of summary judgment to all the defendants. But, we write further regarding governmental immunity because the trial court specifically found two of the exceptions to the KTCA apply to the defendants and the Graggs argue that once a duty to Barbara Gragg is

found, the KTCA exceptions to liability are no longer available. We do not agree with the Graggs' argument, although *Nero*, 253 Kan. 540, can be read to justify the argument they make, at least insofar as it relates to the discretionary function exception, which was found not to apply.

We limit our discussion to WSU and its athletic association, WSUIAAI, which we find to be governmental entities under K.S.A. 1996 Supp. 75-6102(c). "State" is defined by K.S.A. 1996 Supp. 75-6102(a) as "the state of Kansas and any department or branch of state government, or any agency, authority, or institution or other instrumentality thereof." This clearly includes WSU and is consistent with our previous holdings that state universities are entitled to the immunities of the KTCA. See *Boaldin v. University of Kansas*, 242 Kan. 288, 291, 747 P.2d 811 (1987).

We likewise hold that WSUIAAI is an integral part of WSU, as it is controlled and operated by its employees and enjoys the same privileges as WSU. See *Shriver v. Athletic Council of KSU*, 222 Kan. 216, 564 P.2d 451 (1977).

Furthermore, the individual defendants such as Captain Davis and Schafer clearly remained as employees of WSU and are likewise entitled to its protection under K.S.A. 1996 Supp. 75-6102(d). We will not, however, discuss or reach the unnecessary question of whether the sponsors might also be considered "employees," notwithstanding the authorities and arguments presented to us by all of the parties to this appeal.

We are taught by a long line of cases that governmental immunity is the exception to the general rule:

"The Kansas Tort Claims Act makes liability the rule and immunity the exception, and the burden is on the State to establish its entitlement to any of the exceptions set forth in K.S.A. 1992 Supp. 75-6104. *Hopkins v. State*, 237 Kan. 601, 609, 702 P.2d 311 (1985). If the State cannot meet this burden, then the general rule of liability set forth in K.S.A. 75-6103 governs. *Allen v. Kansas Dept. of S.R.S.*, 240 Kan. 620, 622, 731 P.2d 314 (1987); *Jackson v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984)." *C.J.M. v. State*, 253 Kan. 1, 13, 853 P.2d 4 (1993).

Thus, although we have found WSU and WSUIAAI to be governmental entities, they are still required to demonstrate entitlement to one or more of the statutory exceptions from liability.

K.S.A. 75-6103(a) sets forth the general rule of liability:

"(a) Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

The exceptions which would exclude liability are found in K.S.A. 1996 Supp. 75-6104, which reads in applicable part:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

"(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved;

. . . .

"(n) failure to provide, or the method of providing, police or fire protection;

"(o) any claim for injuries resulting from the use of any public property intended or permitted to be used as a park, playground or open area for recreational purposes, unless the governmental entity or an employee thereof is guilty of gross and wanton negligence proximately causing such injury."

We first consider what we believe to be the most applicable of the three claimed exceptions, the failure to provide police protection.

The Graggs' two arguments as to why this exception is not available are without merit. They first argue this exception does not apply when the governmental entity owes a duty which has been breached, citing *Washington v. State*, 17 Kan. App. 2d 518, 525-26, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992). We would not approve such a broad reading of the case as to equate a duty owed to protect a specific individual, rather that the public at large, with a duty owed to protect the public from possible criminal attacks. Certainly, the WSUPD owed no more duty to protect Gragg that it did anyone else attending Celebrate '93. Regardless, we need not reach this ultimate question here because of our previous holding that no defendant owed a duty to Gragg to prevent the shooting.

The Graggs also argue the payment of the security personnel from the special Celebrate '93 account deprives the security officers of immunity based on employment by a governmental entity. This contention ignores the clearly stated fact that the funds came from an account under the direct control of WSU and that all of the hiring of security officers was under the direction and supervision of the WSUPD. Captain Davis possessed ultimate control over the entire security force. The security personnel are clearly entitled to the exception from liability allowed by 75-6104(n) of the KTCA.

In *Beck*, 241 Kan. 13, we found that the security provided by the University of Kansas Medical Center was entitled to the police protection exception of the KTCA. We explained:

"The determination of how to provide police protection is immunized. The Medical Center is not liable because of the methods it adopted for police protection. . . . It would be the function of the University police to implement a warning system effective in warning all individuals in the Medical Center. . . . Both the duty to protect and the duty to warn, on the facts alleged, thus fall within the police protection exception, and we hold that the trial court was correct in finding the Medical Center immunized from liability pursuant to K.S.A. 75-6104[n]." 241 Kan. at 24.

Just prior to making the above statement, *Beck* restated our court's previous discussion of the aims of the police and fire protection exception to the KTCA in *Jackson v. City of Kansas City*, 235 Kan. 278, 292, 680 P.2d 877 (1984), where we said:

"We believe subsection [n] is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe subsection [n] is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection."

Thus, it is clear that the claims made herein by the Graggs, which run to the nature and type of police protection utilized for Celebrate '93, are exactly the kind of actions we have found to be immunized by the KTCA. For cases with similar holdings relating to the application of the police protection exception, see *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 698 (10th Cir. 1988), and *Allen v. Board of Com'rs of County of Wyandotte*, 773 F. Supp. 1442, 1455-56 (D. Kan. 1991).

Under the undisputed facts of this case, the actions of WSU and its police department clearly invoke the police protection exception of K.S.A. 1996 Supp. 75-6104(n), which also forms a proper basis for the grant of summary judgment below.

In addition, valid arguments could be made that the discretionary function exception, K.S.A. 1996 Supp. 75-6104(e), and the recreational area exception, K.S.A. 1996 Supp. 75-6104(o), are also applicable, but due to the result we reached above concerning the police protection exception, it is unnecessary to further discuss either one.

*Summary judgment was not prematurely granted.*

Finally, we briefly consider the Graggs' argument that summary judgment was prematurely granted before the completion of discovery. We held in *Brick v. City of Wichita*, 195 Kan. 206, 212, 403 P.2d 964 (1965), that the granting of summary judgment prior to the completion of discovery is a matter within the trial court's discretion and will be upheld unless clearly erroneous.

A large amount of discovery had been taken in this case, establishing all of the uncontroverted facts upon which our judgment has been based. The Graggs complain that the defendants had not yet named their expert witnesses, but they cannot expect such persons to raise different issues of fact supporting the Graggs' arguments which would enable them to survive summary judgment.

The facts in this case had been essentially established. The time for the completion of discovery had almost expired when summary judgment was granted. The Graggs made no request under K.S.A. 60-256(f) for additional time to oppose the summary judgment

motion. We cannot find reversible error in the trial court's granting of summary judgment at the time it did.

Affirmed.

ABBOTT, J., not participating.

E. NEWTON VICKERS, Senior Judge, assigned.