No. 93,066

ISAAC JOHN SOUTH, a minor, by and through his parents and next friends JOHN SOUTH and LINDA SOUTH *Appellants*, v. JAMES JOHNSON AUBREY MCCARTER, a minor, and MARK MCCARTER and JILL MCCARTER, his natural guardians; JOSHUA ALLEN MILLS, a minor, and LORETTA KAY TINDELL and MICHAEL ALLEN MILLS, his natural guardians; AMERICAN FAMILY MUTUAL INSURANCE COMPANY; and S AND J INVESTMENTS OF TOPEKA, INC., *Appellees*.

(119 P.3d 1)

Opinion filed September 9, 2005.

*Frank D. Taff*, of Topeka, argued the cause and was on the briefs for appellant.

*Leonard R. Frischer*, of Frischer & Associates, Chtd, of Overland Park, argued the cause, and *Michael L. Hughes,* of the same firm, was with him on the brief for appellees S and J Investments, Inc., of Topeka.

No appearance by appellees James Johnson Aubrey McCarter, Mark McCarter, and Jill McCarter.

The opinion of the court was delivered by

DAVIS, J.: Isaac John South, a minor, was injured during a physical altercation with defendants Joshua Mills and James McCarter in the mobile home park where both Isaac and Joshua lived with their parents. Isaac's parents brought suit on behalf of their son against Joshua and James, their parents, American Family Mutual Insurance Company, and the owner/manager of the mobile home

park, defendant-appellee S and J Investments of Topeka, Inc., (S and J). Relevant to this appeal, the district court granted summary judgment in favor of S and J, finding it was not negligent as a matter of law and was not the legal cause of Isaac's injuries. The Court of Appeals granted the plaintiffs' application to take a civil interlocutory appeal, and the case was transferred to this court pursuant to K.S.A. 20-3017.

On September 3, 2001, plaintiffs Linda and John South entered into a "Rental Agreement for Manufactured Home Site" (rental agreement) with the owners of Green Acres Mobile Home Park (Green Acres), defendant S and J. Although the rental agreement was signed only by John and Linda, their minor son, Isaac South, was listed on the agreement as a resident of the home in Green Acres. In the agreement, Linda and John agreed to abide by all of the Green Acres Community Guidelines (community guidelines).

Section 5, Installation of New & Existing Mobile Homes, provides in relevant part: "The management reserves the right to (1) refuse admittance and accommodations to anyone without stating any cause or reason, (2) decline to allow any space to be occupied, or (3) refuse to accept further rent."

Section 8, "Liability of Management," provides in part:

"(a) It is understood and agreed by the residents that all common areas furnished by Green Acres Community such as automobile parking spaces, streets and recreational facilities shall be deemed gratuitously furnished and that if the Resident or any other person used the same, it shall be at the user's [sic] own risk. All persons using any facilities do [sic] so at their own risk."

Section 14, entitled "Noise," provides:

"(a) Avoid excessive noise. Play radios, televisions and stereos softly. Have respect for your neighbors. Residents must be responsible for the conduct of their guest. The property is privately owned and the right to evict any objectionable person or persons who may cause a disturbance or become a nuisance is reserved. The management shall be the sole judge of the existence or cause of such action."

On May 11, 2002, plaintiffs and defendants Joshua Mills and his parents Michael Mills and Loretta Tindell lived in the Green Acres Mobile Home Park owned by defendant S and J. That evening, Isaac drove past the Mills home on his way home from work. Joshua and James testified that Isaac was staring at them as he

drove by. Joshua testified that he asked Isaac why he was staring at him, and they had a conversation where Isaac threatened them. Isaac testified that they starting cussing at him as he was driving by. Isaac drove home, changed his clothes, and walked back to the Mills' residence to see what their problem was.

Joshua and James were standing in the Mills' yard when Isaac arrived. The three minors offered conflicting accounts of what happened next. Isaac testified that Joshua was holding a BB gun and told him to leave. They exchanged words and Joshua took a swing at Isaac, James punched Isaac in the face, knocking out his tooth, and Isaac fell to the ground where James and Joshua kicked him. Isaac retreated to the road but returned near the Mills' vehicle to retrieve his hat. When he was leaning over to pick up his hat, James punched him in the mouth and broke his jaw.

Joshua and James characterized Isaac as the aggressor who swung at Joshua first. Joshua's father Michael Mills heard cussing and came outside and twice told Isaac to go home, but he refused. Loretta Tindell also came outside. When Isaac came back into the yard to retrieve his hat, James saw a knife, so he punched Isaac in self-defense. Michael Mills also testified that he saw a knife in Isaac's hand and he found a knife in the yard the next morning. After James punched Isaac, Isaac walked home.

Isaac's father, John South, testified that when Isaac arrived home he looked as if he had been beaten because his jaw was hanging down and he was bleeding. Isaac said he had been "jumped," and his father took him to the emergency room. Isaac had emergency surgery to wire his jaw back together, and then he had subsequent surgeries that required two bone grafts from his bottom jaw. His medical expenses were approximately $30,000 at this point, and he will require further medical treatment.

Nearly 2 years before this incident occurred, Jack Benge, a shareholder of S and J, received a complaint from a Green Acres tenant's babysitter that two boys were cussing in the mobile home park and asked if something could be done. The tenant explained that she thought one of the boys lived up the street. Benge spoke with John Carey, an officer of S and J and owner and operator of Modern Mobile Home Sales, a neighboring mobile home park.

Carey identified one of the boys as a resident of Modern Mobile Home Sales who was being evicted, and he identified the other possibly as James McCarter.

At Benge's direction, his attorney Jerold Berger sent James a letter dated July 18, 2000, which provided in relevant part:

"It has been brought to my attention that you have been coming on the property even though the owners and operators have requested that you stay off the property.

"Please consider this a formal request to stay off of the property known as Green Acres Mobile Home Community. Should you continue to violate this request you will be guilty of a criminal trespass. It is our intentions to fully follow through with prosecuting you if you continue to trespass on this property."

In his deposition, Benge denied knowing where the information for the substance of this letter was obtained, nor did he know of anyone who had spoken with James. James' father, Mark McCarter, signed a sworn declaration that he reviewed this letter after his son received it in the mail. Mark spoke with the park manager about the letter, and the park manager said the letter resulted from information she had that James might have been involved in a fight on the premises. Mark told the manager that James was not involved in a fight and that James had an aunt who lived on the premises. The manager agreed to allow James back on the premises because she did not have any evidence that James was involved in a fight and because his aunt lived on the premises.

Nancy Ketter, the operations manager at the time, denied having this conversation with Mark McCarter. Ketter had no knowledge of James being seen on the Green Acres property until the day of the subject fight, and she testified that no additional letters or further action had been taken against James. Ketter received no reports that James was on the property after the July 18, 2000, letter was sent, and she did not inform the other tenants that he had been advised to stay off of the premises.

The plaintiffs filed an action against James and his parents Mark and Jill McCarter, Joshua and his parents Michael Mills and Loretta Tindell, and American Family Mutual Insurance. The district court allowed the plaintiffs to amend the petition to add S and J

as a defendant. Relevant to this appeal, the plaintiffs alleged in the amended petition:

"37. That notwithstanding the judgment of defendant S AND J INVEST-. MENTS INC. OF TOPEKA that defendant McCarter was an 'objectionable person or persons who may cause a disturbance or become a nuisance,' the former [allowed] the latter to continue to come on the premises to associate with defendant Tindell and her son, the minor defendant Joshua Allen Mills.

"38. That neither at the time plaintiffs entered into the said landlord-tenant agreement, nor at anytime thereafter, were they aware of the aforesaid judgment having been made by defendant S and J Investments of Topeka, Inc., or that it was suffering the minor defendant McCarter to continue to come on the premises to associate with Loretta Kay Tindell and her son, the minor defendant Joshua Allen Mills, or that these residents constituted a danger to the safety and welfare of other tenants of the mobile home park.

"39. That defendant S AND J INVESTMENTS INC. OF TOPEKA knew or should have known that Loretta Kay Tindell and minor defendant Joshua Allen Mills were allowing the minor defendant James Aubrey McCarter to come onto the premises and that the two minor defendants presented a danger to the safety and welfare of the residents, including the plaintiffs.

"40. That by the common law of this state, the owner of a business has a duty to provide security for patrons or customers on the premises when circumstances exist from which the owner could reasonably foresee a risk of peril above and beyond the ordinary and that appropriate security measures should be taken.

"41. That defendant S AND J INVESTMENTS INC. OF TOPEKA breached its duty to plaintiffs by failing and refusing to take further action to prevent the minor defendant James Johnson Aubrey McCarter from coming on the premises; and that said breach is the proximate cause of the injuries and losses suffered by the plaintiff, as is more fully set out above.

"42. That defendant S AND J INVESTMENTS INC. OF TOPEKA breached its duty to plaintiffs by failing and refusing to evict Loretta Kay Tindell and her son, the minor defendant, Joshua Allen Mills from the premises; and that said breach is the proximate cause of the injuries and losses suffered by the plaintiff, as is more fully set out above."

On September 25, 2003, the district court granted Loretta Tindell's motion for summary judgment and stayed the proceedings against Michael Mills because he had filed for bankruptcy. The court reasoned that the plaintiffs failed to show that Joshua acted willfully or maliciously or that he intended to cause injury to Isaac necessary for a claim under K.S.A. 38-120 (recovery from parents for malicious or willful acts by certain children), that Loretta exercised reasonable care by taking steps to end the fight, and that

she was, thus, not liable for a failure to intervene. The court found that had Michael not filed for bankruptcy, his motion for summary judgment would have also been granted.

On January 8, 2004, the district court granted summary judgment to Joshua because he did not cause Isaac's injuries. As to defendants Mark and Jill McCarter, the court found that a genuine issue existed as to whether their son James had acted willfully or intended to cause injuries to Isaac. However, because the plaintiffs did not present evidence that the injuries were the result of parental neglect on the part of the McCarters, the court granted them partial summary judgment by limiting their liability to $5,000 under K.S.A. 38-120.

S and J filed a motion for summary judgment arguing that it was not liable for Isaac's injuries because it could not have reasonably foreseen that Isaac would go to the Mills' residence and fight with Joshua and James, nor could it have provided reasonable security to prevent it from happening. As reasonable persons could only arrive at one conclusion, that the fight was not foreseeable, it argued that summary judgment should be granted as a matter of law.

The plaintiffs' response to the summary judgment motion raised several arguments: (1) The attack occurred in a common area reserved for control by S and J; (2) S and J was aware of James' propensities and failed to warn the plaintiffs; (3) this case was distinguishable from *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 934 P.2d 121 (1997); *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 819 P.2d 587 (1991); and *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 856 P.2d 1332 (1993), where no landlord-tenant relationship existed and the case was more analogous to the university/student relationship in *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993); (4) S and J was ignoring its prior knowledge and efforts (by letter) to keep James out of Green Acres and credibility issues arose regarding the contents of the letter; (5) conflicting evidence was presented regarding the material fact of whether S and J had allowed James back on the premises after the letter was sent; (6) a special relationship was created through the rental agreement which provided S and J with the sole right to prevent James from

coming on the premises, which was similar to the student-university relationship in *Nero*; (7) S and J undertook a duty for a third party, Isaac, under Restatement (Second) of Torts § 324A (1964); and (8) a special relationship existed under Restatement (Second) of Torts § 314A (1964) and *Fortney v. Hotel Rancroft, Inc.*, 5 Ill. App. 2d 327, 125 N.E.2d 544 (1955), because the rental agreement required S and J to exercise vigilance for the security of the plaintiffs; a question of fact exists on whether S and J was negligent in carrying out its responsibilities once having assumed the duty to keep troublemakers off the premises under Restatement (Second) of Torts § 323 (1964), *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 657 P.2d 532 (1983), and *Cunningham v. Braum's Ice Cream & Dairy Stores*, 276 Kan. 883, 80 P.3d 35 (2003).

S and J responded, arguing the letter written 2 years prior to the incident did not constitute foreseeability, S and J had no prior knowledge that Isaac would confront Josh and James and engage in a fight, the plaintiffs misinterpreted Section 14 of the rental agreement which applies to noise caused by tenants, S and J did not breach its contract because the agreement reserves the right to "evict" any person and not "eject" any objectionable person as argued by the plaintiffs, and the fight was not foreseeable under the totality of the circumstances.

On August 13, 2004, the district court granted S and J's motion for summary judgment, reasoning:

"As a matter of law, Defendant S and J Investments was not negligent. First, Defendant did not have a duty to evict the Tindell family under the facts when viewed in light most favorably for Plaintiff. Second, neither Joshua Tindell, Loretta Tindell, nor S and J Investments were the legal cause of Plaintiff's injuries. See September 25, 2003 Memorandum Decision and Order and January 8, 2004 Memorandum Decision and Order. Finally, because Plaintiff's evidence is susceptible to only one legal inference, the question of proximate cause is a question of law. *Cullip by & Through Pitts v. Domann by & Through Domann*, 266 Kan. 550, 556 (1999). Accordingly, the Court finds no liability on Defendant S and J Investments."

The plaintiffs filed a motion for additional findings and for amendment of the judgment in favor of S and J to allow application

to the Court of Appeals for an interlocutory appeal and for a stay. The plaintiffs argued that the trial court had misconstrued their claim by resting its ruling on the conclusion that the plaintiffs' claim against S and J was based solely upon its failure to evict the Tindell (Mills) family. The plaintiffs pointed to their claims in the second amended petition that S and J breached its duty to the plaintiffs by failing to take further action to prevent James from coming on the premises after he had earlier been banished from the mobile home park. The plaintiffs reiterated their arguments under Restatement (Second) of Torts § 323 and § 324A.

S and J responded that the motion included additional arguments not raised in the plaintiffs' response to its motion for summary judgment. The trial court agreed, ruling that a surreply was not allowed under Shawnee County Rule 3.202(b). However, it granted the motion for interlocutory appeal and stay under K.S.A. 60-2102, reasoning:

"This Court has made a finding that, as a matter of law, S & J Investments was not negligent. This Court feels this finding creates a substantial ground for difference of opinion. While this Court feels there was no duty to plaintiff by S & J, it is conceivable that an Appellate Court may view this controlling question of law differently. The law generally does not support summary proceedings against a party seeking such redress. Failure to stay these proceedings could lead to trial which is not economically wise for the parties."

The plaintiffs filed an interlocutory appeal with the Court of Appeals. This court granted the plaintiffs' subsequent motion to transfer the case to the Supreme Court pursuant to K.S.A. 20-3017.

On appeal, the plaintiffs argued the trial court failed to carefully analyze and apply the Restatements and Kansas case law in granting summary judgment to S and J. They contend that S and J owed them a duty and was negligent in rendering the service it recognized as necessary for the protection of the South family under the landlord-tenant rental agreement and the "Community Guidelines" under both Restatement (Second) of Torts § 323 (1964) and Restatement (Second) of Torts § 324A (1964). Additionally, the plaintiffs contend that S and J is liable under various provisions of the Restatement addressing premises liability, including Restate-

ment (Second) of Torts § 341A (1964), Restatement (Second) of Torts § 314A, and Restatement (Second) of Torts § 344.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

" 'In a negligence action, summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact.' " *Schmidt v. HTG, Inc.*, 265 Kan. 372, 396-97, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998) (quoting *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 [1992]).

In Kansas, a plaintiff in a negligence action must first prove the existence of a duty owed to him or her by the defendant. The existence of a duty is a question of law over which this court's review is unlimited. *Roe v. Kansas Dept. of SRS*, 278 Kan. 584, 592, 102 P.3d 396 (2004).

## Premises Liability

The plaintiffs argue that S and J is liable under various provisions of the Restatement addressing premises liability. They cite several cases discussing these Restatement principles which they argue are analogous to this case. S and J argues it is not liable under a premises liability theory and urges this court to disregard many of these arguments because they are being raised for the first time on appeal.

Examination of the pleadings below, specifically the plaintiffs' response to the motion for summary judgment, reveals that the

plaintiffs did make some premises liability arguments below concerning special relationships formed under § 314A and that the relationship here was similar to the university/student relationship in *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993), which discussed the applicability of § 344. Although the arguments on appeal expand upon those arguments raised below, we reject S and J's contention that the plaintiffs' arguments are raised for the first time on appeal. Moreover, the trial court did not address all the questions regarding the existence of a duty but concluded that no duty arose under the rental agreement to evict the Tindell (Mills) family, whom James was visiting at the time of the incident giving rise to this lawsuit.

The prevailing rule in Kansas is that in the absence of a "special relationship" there is no duty on a person to control the conduct of a third person to prevent harm to others. *D.W. v. Bliss*, 279 Kan. 726, Syl. § 3, 112 P.3d 232 (2005). " 'A special relationship may exist between parent and child, master and servant, the possessor of land and licensees.' " *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1045, 934 P.2d 121 (1997) (quoting *C.J.W. v. State*, 253 Kan. 1, 8, 853 P.2d 4 [1993]). Restatement (Second) of Torts § 314A (1964) sets forth the basis for the existence of a special relationship in cases involving a possessor of land:

"Special Relations Giving Rise to Duty to Aid or Protect
"(1) A common carrier is under a duty to its passengers to take reasonable action
    (a) to protect them against unreasonable risk of physical harm, and
    . . . .
"(2) An innkeeper is under a similar duty to his guests.
"(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation."

The reporter's notes to § 314A contain statements of the drafters as to the provisions in issue. Comment e explains:

"The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk. . . . He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate."

Citing § 314A, the plaintiffs point to *Fortney v. Hotel Rancroft, Inc.*, 5 Ill. App. 2d 327, 125 N.E.2d 544, *reh. denied* (1955), where

the Illinois Appellate Court found that an innkeeper owes his or her guest a very high degree of care and must protect his or her guest while at the inn against injuries from third persons. *Fortney* provides little support for the plaintiffs' position, however, as the duty owed by an innkeeper to a guest in Illinois ("very high degree of care") is different from the reasonable care standard owed by a landlord to a tenant in Kansas, as discussed below.

In this case, the plaintiffs hinge a good portion of their argument on the fact that a special relationship and therefore a duty existed by reason of the rental agreement requiring S and J to exercise vigilance for the security of the South family. They emphasize the agreement's reservation of the exclusive right to determine who was an objectionable person and to eject any such person from Green Acres with or without cause. The plaintiffs cite several cases in support of their argument; however, review of the rental agreement and community guidelines do not support a finding that a contractual duty to provide security existed in this case.

The plaintiffs cite *Bundy v. Sky Meadows Trailer Park,* 1989 WL 125379 (Ohio App., unpublished opinion filed October 23, 1989), where the plaintiff was bitten by a dog owned by another resident of a trailer park owned and operated by Sky Meadows. The plaintiff sued Sky Meadows and the dog's owners for negligence resulting in the dog bite. Facts were established to indicate that Sky Meadows had actual knowledge that the dog ran freely around the trailer park and had bitten other children in the past. Furthermore, Sky Meadows had a rule stating that "animals must not run at large," which was never enforced against the owners of this particular dog, despite its past attacks on children. 1989 WL at *1-2.

The *Bundy* court first distinguished a mobile home trailer park from an apartment complex because the common premises of the park and the residents' conduct may be restricted or controlled by park rules. The court held that Sky Meadows had a duty to enforce the rules and regulations of the trailer park; hence, by contract, Sky Meadows had a duty to prevent animals from roaming the premises of the park. Further, the court stated a "special relation" existed due to the fact that Sky Meadows had knowledge of the dog's vicious propensities and promulgated rules prohibiting ani-

mals from running at large. Notice and knowledge of a dog's propensity to roam and attack children obligates the trailer park operator to take affirmative action. 1989 WL at *2-3.

In order for *Bundy* to have relevance to this case, the plaintiffs must establish that the defendants in this case undertook to provide security for the plaintiffs. Two Kansas cases are important in this regard. In *Beshears v. U.S.D. No. 305*, 261 Kan. 555, 930 P.2d 1376 (1997), Beshears was a high school student who was injured in an after-school-hours, off-school-premises, prearranged fight with another troubled disruptive student who had warned the school counselor and assistant principal 2 days before the fight about the problem between them because he was worried about getting expelled. The district court found no duty existed and granted summary judgment in favor of the school district in a negligence action.

On appeal, Beshears argued in part that the school district breached its duty to him during school hours, when a special relationship existed between them, to follow its own policy of giving in-school suspension for after-school fights even if the fight occurred off school premises, if it was based on statements made at school. The school district's expulsion policies did not mandate suspension or expulsion but left the decision to the school's discretion. This court found that the policy did not show that the school district undertook to protect its students from unknown prearranged off-school-premises fights and its efforts to regulate after-school fighting did not impose an absolute duty to control off-school-premises fighting. 261 Kan. at 563.

In *Parker v. Dillon Co. Inc.*, No. 90,108, unpublished opinion filed January 30, 2004, *rev. denied* 277 Kan. 925 (2004), a customer brought negligence and breach of contract claims against a grocery store and the store's private security contractor when he was injured after interrupting an armed robbery. On appeal, the customer argued the contractor undertook to render services to the store which it should have recognized were necessary for the protection of customers; therefore, based on Restatement (Second) of Torts § 324A (1964), the store had a legal duty to protect customers from foreseeable criminal activity.

In determining whether a duty arose under a provision which explained the scope of the undertaking by the contractor's security guards, the court noted that the provision included services to protect not only Dillon's property, but also "people." The court acknowledged that a broad reading might lead to the conclusion that "people" included customers, but it found that the more appropriate reading was that "people" referred to employees. The court reasoned: "Courts should not strain themselves to create ambiguity in a written instrument where, in common sense, there is none." Slip. op. at 6.

In this case, Section 14 of the Green Acres Community Guidelines, entitled Noise, provides:

"(a) Avoid excessive noise. Play radios, televisions and stereos softly. Have respect for your neighbors. Residents must be responsible for the conduct of their guest. The property is privately owned and the right to evict any objectionable person or persons who may cause a disturbance or become a nuisance is reserved. The management shall be the sole judge of the existence or cause of such action."

S and J argues that this provision only provides S and J with the authority to "evict" a noisy tenant. S and J points to the use of the word "evict" rather than "eject." Evict is defined as: "To expel (a person, esp. a tenant) from real property, usu. by legal process. Also termed put out." Black's Law Dictionary 594 (8th ed. 2004). Eject is defined as: "To cast or throw out" or "To expel or thrust out forcibly (*e.g.*, disorderly patrons)." Black's Law Dictionary 556 (8th ed. 2004).

While the term "evict" is usually applicable to tenants, we note that S and J uses the term "person" rather than resident after specifically referencing *both residents and guests*. In contrast to *Parker*, a common-sense reading of this provision would read "person" in a broader sense to encompass both residents and guests, and conclude that S and J was trying to reserve the right to evict any objectionable person who causes a disturbance or becomes a nuisance, not just its residents or tenants.

However, we must also read the language in the context of the provision's aim. Rather than dealing with the security of tenants, this provision aims to curb excessive noise in the trailer park. This distinguishes the facts of this case from *Bundy*, where Sky Mead-

ows had knowledge of the dog's vicious propensities and promulgated rules in the rental agreement prohibiting animals from running at large so that the duty was apparent. Moreover, the language does not mandate that S and J evict any objectionable person; rather, the decision is discretionary as in *Beshears*. We conclude that the above provision imposed no contractual duty upon S and J to provide security for its tenants.

S and J also briefly refers to the Landlord's Duties provision which provides that except for conditions beyond the landlord's control, the landlord shall "[m]aintain all common areas of the Manufactured Home Community in a clean and safe condition." Section 8(a) of the community guidelines provides that common areas include automobile parking spaces, streets, and recreational facilities. The undisputed evidence in this case established that James delivered the final blow while they were standing in the Mills' yard on a grassy area near where the Mills' vehicle was parked. Thus, we conclude that the above guideline created no duty on the part of S and J to protect the tenants from the harm that resulted in this case.

The other provision S and J cited before the trial court provided: "The management reserves the right to (1) refuse admittance and accommodations to anyone without stating any cause or reason." However, when taken in context, this provision referred to the installation of new and existing mobile homes in the mobile home park. We conclude that this provision did not impose a contractual duty upon S and J to monitor the security risk of guests of tenants of Green Acres.

A question remains whether a special relationship existed between S and J and Isaac arising out of their relationship as a landlord-tenant or landowner/invitee-licensee. Although Kansas law previously provided that the duty owed by a possessor of real property to an entrant upon the property was dependent upon the entrant's status, this court has eliminated the common-law distinctions between the duties owed to licensees and invitees and set up reasonableness of action and foreseeability of injury as the foundations of premises liability. *Cunningham v. Braum's Ice Cream & Dairy Stores*, 276 Kan. 883, 886, 80 P.3d 35 (2003).

" 'The duty owed by an occupier of land to invitees and licensees alike is one of reasonable care under all the circumstances. Included in the factors that are to be considered in determining whether, in the maintenance of his or her property, the land occupier exercises reasonable care under all circumstances are the foreseeability of harm to the entrant, the magnitude of the risk of injury to others in maintaining such a condition of the premises, the individual and social benefit of maintaining such a condition, and the burden upon the land occupier and/or community, in terms of inconvenience or cost, in providing adequate protection.' " 276 Kan. at 886 (quoting *Jones v. Hansen*, 254 Kan. 499, 509-10, 867 P.2d 303 [1994]).

Premises liability law is not limited to cases where there is a physical defect in the premises. See *Walters v. St. Francis Hosp. & Med. Center, Inc.*, 23 Kan. App. 2d 595, 598-601, 932 P.2d 1041, *rev. denied* 262 Kan. 969 (1997) (ordinary and reasonable care does not require a hospital to warn an invitee about the possibility of becoming queasy or fainting from witnessing a medical procedure because this is a danger that is open, obvious, and known to the invitee). Restatement (Second) of Torts § 341A (1964) provides:

"A possessor of land is subject to liability to his invitees for physical harm caused to them by his failure to carry on his *activities* with reasonable care for their safety if, but only if, he should expect that they will not discover or realize the danger, or will fail to protect themselves against it." (Emphasis added.)

The plaintiffs argue that a duty arises under Restatement (Second) of Torts § 344 (1964), which is entitled "Business Premises Open to Public: Acts of Third Persons or Animals." Restatement (Second) of Torts § 344 (1964) provides:

"A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
   (a) discover that such acts are being done or are likely to be done, or
   (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

The comments give an explanation of the section:

"f. *Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to

occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual."

The plaintiffs cite *Griffin v. West RS, Inc.*, 97 Wash. App. 557, 570, 984 P.2d 1070 (1999), where the Washington Court of Appeals held that the special relationship between landlord and tenant is the same as the relationship between a business and its invitee. However, the plaintiffs fail to recognize that the Washington Supreme Court reversed this case on appeal and declined to reach the duty of care issue. See *Griffin v. West RS, Inc.*, 143 Wash. 2d 81, 88, 18 P.3d 558 (2001).

This court has applied the principles of § 344 in circumstances involving a landlord-tenant or university/student relationship in *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993). In *Nero*, a plaintiff female college student who was sexually assaulted by another student in a coed dormitory filed a negligence suit alleging the university had a duty to protect her and had failed to exercise reasonable care to do so. The university was aware that the alleged perpetrator had been charged with rape for an incident that had occurred approximately 1 month earlier in another coed dormitory and had temporarily assigned him to reside in an all-male dormitory; however, he was subsequently permitted to move into another coed dormitory where the second alleged sexual assault took place. The trial court granted summary judgment for the university, and the plaintiff appealed arguing the university had a duty to protect the residents of university residence halls.

This court found that the university/student relationship does not in and of itself impose a duty upon universities to protect students from the actions of fellow students or third parties. Citing Restatement (Second) of Torts § 344 (1964), the court also noted the general rule that a landowner has no duty to protect an invitee on the landowner's premises from a third party's criminal attack unless the attack is reasonably foreseeable and prior similar acts committed upon invitees furnish actual or constructive notice to a landowner. The court found that the university, as a landlord furnishing housing to its students, owed student tenants the same duty

to exercise due care for their protection as a private landowner owes his or her tenants. As such, it concluded that "a university has a duty of reasonable care to protect a student against certain dangers, including criminal actions against a student by another student or a third party if the criminal act is reasonably foreseeable and within the university's control." Because reasonable people would disagree whether the attack was foreseeable, the district court erred in granting summary judgment when an issue remained for the trier of fact. 253 Kan. at 583-85.

Although this case likewise involves a landlord-tenant relationship, *Nero* is different from this case as it involved a rape in the context of a student/university relationship and the university possessed concrete information concerning previous alleged criminal conduct. Moreover, the university as landlord had taken reasonable steps to keep the alleged perpetrator away from the location of the incident (coed dorm) but then shortly thereafter allowed the perpetrator to return without warning to the residents. In this case, there is no mention in the letter from S and J's attorney what conduct James allegedly engaged in. The evidence falls short of clearly suggesting past criminal conduct on the part of James and rather suggests rowdy conduct and cursing. Even when viewing the evidence in the light most favorable to the plaintiffs, the evidence that James had been involved in a previous fight is tenuous at best, given that in the same conversation where the suggestion of fighting occurred there was evidence he was not fighting and thus was granted permission to come back onto S and J's property.

Given the risk in *Nero*, and knowledge of that risk by the landlord, it is understandable that we concluded the landlord had a duty to exercise reasonable care to protect its tenants from a third party's criminal attack, for such an attack was reasonably foreseeable and within the landlord's control. Can the same be said in the case we now consider where a landlord-tenant relationship clearly exists? We think not. Before deciding the issue, however, we further examine the issue of foreseeability. S and J relies primarily upon *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 934 P.2d 121 (1997), for the definition of foreseeability.

In *Gragg*, the heirs of Barbara Gragg brought a wrongful death and survival action against Wichita State University and others after she was shot and killed while attending a fireworks display on the campus. The heirs argued the defendants failed to provide adequate security and lighting for the event and failed to warn of the potential for crime on or near the campus under the totality of the circumstances. The district court granted summary judgment in favor of WSU and the other defendants.

In considering whether WSU owed Gragg a duty to prevent the shooting, the court discussed *Nero* and *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 856 P.2d 1332 (1993). Of importance to this case, the court distinguished *Gragg* from *Nero* because it was not "a landlord-tenant situation where control could have been exercised over a known attacker in proximity to protect an unknowing victim." It found *Seibert* more instructive, where this court considered whether a shopping center was liable to a woman who was shot in the parking lot. 261 Kan. at 1054. It quoted *Seibert*'s holding that an owner may be liable for the criminal acts of third parties in the business' parking lot where " 'circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken,' " and adopted the test for determining the foreseeability requirement as " 'the totality of the circumstances rule.' " 261 Kan. at 1054 (quoting 253 Kan. 540, Syl. ¶ 4; 253 Kan. at 548.) It further quoted:

" 'It is only where the frequency and severity of criminal conduct substantially exceed the norm or where the totality of the circumstances indicates the risk is foreseeably high that duty should be placed upon the owner of the premises to provide security. The duty to provide security is determined under the reasonable person standard.' " 261 Kan. at 1055 (quoting 253 Kan. at 549-50).

The *Gragg* court also quoted *Cupples v. State*, 18 Kan. App. 2d 864, 861 P.2d 1360 (1993):

" 'Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted.] An injury is foreseeable so as to give rise to a duty of

care where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm.' " 261 Kan. at 1056.

Under the facts of *Gragg*, the only similar incident was a shooting at a festival on another part of campus 2 years earlier, the facts did not show that the high crime level of the neighborhoods surrounding WSU had posed a security problem for previous firework displays, and no one participating in the production had any knowledge that the perpetrator intended to shoot anyone on the WSU campus. As such, the *Gragg* court concluded that the Graggs failed to show a special duty existed on the part of WSU to protect Gragg from the unanticipated and unexpected attack and it was not foreseeable under the totality of the circumstances that the perpetrator would shoot Gragg. 261 Kan. at 1056-57.

*Gragg* is obviously distinguishable from this case in that it did not involve a landlord-tenant relationship and the risk of harm must have been "foreseeably high." However, it does set forth a totality of the circumstances standard of review and illustrates a past situation where we found that a similar shooting incident which had happened 2 years earlier in *Gragg* was not enough to make the current shooting foreseeable.

On the other hand, the plaintiffs cite the following cases where the courts found the conduct may have been foreseeable. In *Cusmano v. Lewis*, 55 Pa. D. & C.4th 1 (2002), the child of a tenant in a mobile home park shot and killed the teenage son of another tenant. The victim's parents brought suit against the child's parents and the mobile home park owner, arguing the owner had a duty *outside* the obligations it undertook as a result of the lease agreement to maintain the premises to make it safe for persons thereon. The owner filed a general demurrer to the claim of liability claiming it owed no legal duty to prevent the shooting. The court found in relevant part:

"[T]he mobile home park was essentially a landlord with regard to the mobile home community and, as such, had an obligation to protect its tenants against not only foreseeable negligent, but also intentional, acts of third persons. *The plaintiffs assert that the mobile home park had received specific knowledge of the violent propensities of the minor . . . yet, despite this knowledge, it did not take steps to remove this danger from its community by any means whatsoever. Neither did*

*they attempt to warn or protect the tenants.* The mobile home park chose to merely ignore the problem." (Emphasis added.) 55 Pa. D. & C.4th at 6.

In denying the demurrer, the court found that the plaintiffs' allegations of the mobile home park's owner's knowledge of the dangerous propensities of the minor and the defendant's failure to act created a question of fact. 55 Pa. D.&C.4th at 6. The conduct in this case and the one we now consider are worlds apart. The questions that must be asked in this case are what knowledge did S and J have and what kind of risk was involved?

The plaintiffs cite *O'Hara v. Western Seven Trees Corp.*, 75 Cal. App. 3d 798, 142 Cal. Rptr. 487 (1977), for the proposition that the liability of a landlord applies where the landlord had prior knowledge of the criminal propensities of a third party. In that case, the appellate court overturned a judgment of dismissal in a case where a female tenant who was raped in her apartment claimed that the owners of the apartment complex were negligent in failing to provide adequate security, in misrepresenting the security measures in effect on the premises, in concealing information concerning a man who had raped several female tenants, and in failing to warn her of the danger of rape. In finding potential liability existed, the court reasoned that the plaintiff was not the victim of a sudden unexpected outburst but, rather, fell prey to the same type of criminal conduct that had happened to the other tenants, of which the owners were aware of but failed to provide adequate security or warn the plaintiff. 75 Cal. App. 3d at 801-03. However, the plaintiffs' reliance upon *O'Hara* does not help their case as it is clearly distinguishable wherein the court concluded that the landlord not only failed to warn the plaintiff of the danger of rape, but also concealed information of the rape of several female tenants so that she might agree to become a tenant.

Finally, our analysis in *Beshears* bears repeating. As discussed above, this court found it was not reasonably foreseeable to school officials that Beshears would voluntarily arrange to fight with another student after track practice at an isolated site away from school, even though the troubled and disruptive student had warned the school counselor and assistant principal 2 days before the fight about the problem between them. 261 Kan. at 564.

Viewing the evidence in the light most favorable to the plaintiff, we conclude under the totality of circumstances that the harm to Isaac was not foreseeable as a matter of law. See *Nero*, 253 Kan. at 583 (whether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact—it is only when reasonable persons could arrive at only one conclusion that the court may determine the question as a matter of law). We arrive at this conclusion noting the lack of specific information as to James' past conduct and the actual risk involved. Moreover, at the time of this incident, 2 years had elapsed from the date of the letter to the date of the incident giving rise to this lawsuit with no evidence that James had been involved in any other incidents on S and J property. S and J had no knowledge that any current problems existed between Isaac and James or that a fight might be taking place. Under the totality of the circumstances, the trial court did not err in finding that S and J did not owe a duty to the plaintiffs under a premises liability theory as the harm to Isaac was not foreseeable.

## Restatement (Second) of Torts § 323 (1964)

The plaintiffs argue that a duty arose under Restatement (Second) of Torts § 323 and S and J was negligent in the services it rendered to the South family as a whole. S and J responds that this provision is not applicable to the facts of this case. This court has adopted § 323 as a correct statement of the law which can support a duty in appropriate circumstances. See *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 490, 657 P.2d 532 (1983).

Restatement (Second) of Torts § 323 (1964), Negligent Performance of Undertaking to Render Services, provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
  (a) his failure to exercise such care increases the risk of such harm, or
  (b) the harm is suffered because of the other's reliance upon the undertaking."

"Section 323 is based upon the legal principle that a valuable consideration is not a prerequisite to the existence of a duty to exercise due care. The law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he

has undertaken, for nonperformance of which an action lies. See 57 Am. Jur. 2d, Negligence § 45, p. 392 and the many cases cited therein. Stated in another way, where one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking the act must generally be performed with ordinary or reasonable care." *Circle Land*, 232 Kan. at 488-89.

The plaintiffs cite *Circle Land* and *Cunningham* in arguing that S and J undertook to render services it recognized as necessary for the protection of the South family under the rental agreement and the community guidelines and a question of fact remains whether it exercised reasonable care and the South family suffered harm as a result of its reasonable reliance upon that undertaking.

In *Circle Land*, the plaintiffs, owners of International Harvester irrigation engines, contacted a product specialist for Amoco Oil for a recommendation on what type of oil should be used in the machines. Defendant International Harvester subsequently conducted a surveillance program on the engines and initially determined that the oil recommended by Amoco was suitable. Subsequently, damage resulted to the machines from the type of oil recommended. At trial, the plaintiffs' theory of liability was based upon § 323, and International Harvester argued it was a mere volunteer that was conducting the surveillance on new engines to obtain information regarding engine problems that would normally occur during the warranty period. This court disagreed and found the evidence supported a claim for recovery under § 323. 232 Kan. at 488-91.

In *Cunningham v. Braum's Cream & Dairy Stores*, 276 Kan. 883, 80 P.3d 35 (2003), the plaintiff customers of the defendant's ice cream store brought a negligence action against the defendant after its employees shooed them out of the store into the path of a tornado. They were injured while driving home when the tornado threw a truck into their car. The evidence established that the defendant's employees were aware at that time that a tornado warning was in effect and had heard reports of a tornado sighting in the area. Additionally, the defendant had an emergency action plan that "if a tornado is sighted, or a Civil Defense warning sounds, anyone not wishing to leave should be directed to the 'milk

room.' " The employees did not tell the plaintiffs about the tornado warning or the emergency action plan. 276 Kan. at 885.

On appeal, the plaintiffs argued in part that summary judgment was inappropriate because a duty arose under Restatement (Second) of Torts (1964), quoting § 323 but citing § 324A. As such, the court addressed both provisions. In discussing whether a duty arose under § 323, the court first discussed the only two Kansas cases which had found a duty arose under § 323, *Circle Land* and *Burgess v. Perdue*, 239 Kan. 473, 481, 721 P.2d 239 (1986). In *Burgess*, this court found a duty arose under § 323 when a doctor voluntarily assumed the responsibility to relay a mother's request for a partial autopsy of her son to the coroner, but he failed to do so and a full autopsy was performed. 239 Kan. at 481-82. The *Cunningham* court quoted from *Burgess* as follows:

" ' "In most of the cases finding liability, the defendant has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that it has been removed, or by depriving him of the possibility of help from other sources. Many of the decisions state that some such element is necessary, and that there can be no liability where the conduct in no way aggravates the situation or misleads the plaintiff, and he is left no worse off than he was before. . . ." ' 239 Kan. at 481 (quoting Prosser and Keeton on Torts, § 56, pp. 381-82 [5th ed.1984])." 276 Kan. at 892-93.

In finding the evidence to support a § 323 duty wanting, the *Cunningham* court found that the only evidence of an undertaking, the emergency action plan, did not compel any particular action by the employees under the facts of this case. Additionally, it distinguished *Circle Land* and *Burgess*, where the defendant's behaviors induced the plaintiffs' detrimental reliance, by holding no duty arose under § 323 because no evidence was presented that the plaintiffs relied upon the emergency action plan. The court concluded that the plaintiffs "cannot demonstrate that they looked to [defendant] for services they now argue [the defendant] had a legal obligation to provide." 276 Kan. at 895-96.

In this case, the plaintiffs argue "there is no factual question as to whether S and J undertook to render services to the South family." As under the premises liability analysis, S and J continues to rely upon the contractual obligations under the rental agreement

and the community guidelines. However, as discussed above, these provisions did not impose a duty upon S and J to provide protection for the tenants of Green Acres. As such, we conclude that the rental agreement and the community guidelines themselves do not demonstrate an undertaking to render services.

However, the question we determine is whether S and J's actions in contacting an attorney and directing him to send a letter to James banning him from the premises constituted an undertaking to render services. A defendant's agreement or affirmative act indicating a willingness to provide services is a threshold requirement for such a duty to arise. *Cunningham*, 276 Kan. at 894. The extent of the undertaking defines the scope of the duty. *McGee v. Chalfant*, 248 Kan. 434, 442, 806 P.2d 980 (1991).

In making this determination, we have looked at how the "undertaking" language is applied in both § 323 and § 324A cases. Aside from *Circle Land* and *Burgess*, in most cases we have not found an undertaking sufficient to give rise to a duty. See, *e.g.*, *Roe v. Department of SRS*, 278 Kan. 584, 595, 102 P.3d 396 (2004) (SRS undertaking to monitor services provided by the Bureau of Indian Affairs and county mental health center was only a limited or incidental undertaking which did not give rise to a § 324A duty); *Cunningham*, 276 Kan. at 896 (emergency action plan was not a sufficient undertaking where it did not speak to the situation presented); *Honeycutt v. City of Wichita*, 251 Kan. 451, 466-67, 836 P.2d 1128 (1992) (school district's handbook that safety patrol should be stationed at railroad crossing as needed was not an affirmative assumption of a duty to provide safety patrol at railroad so as to constitute an undertaking); *Geiger-Schorr v. Todd*, 21 Kan. App. 2d 1, 901 P.2d 515 (1995) (KAAMCO had not undertaken to inform nondirectly insured physicians about certain malpractice coverage).

Likewise in this case, even when viewing the facts in the light most favorable to the plaintiffs, the only evidence of any undertaking is the letter sent by S and J's attorney to James McCarter. The letter provides no insight as to why James had been asked to stay off the premises. S and J's owner explained the letter was sent in response to a tenant babysitter's complaint that boys were cussing

on the premises. The only evidence that the letter was sent in regard to a fight came from James' father's recollection of a conversation with the Green Acres operation manager, who in the same conversation, permitted James to return to the premises because she had no evidence that he was involved in a fight. Under this factual scenario, we conclude that as in *Cunningham*, the letter was not an undertaking to address the situation presented, *i.e.*, to protect the residents of Green Acres from future physical harm by James but, rather, was an undertaking to respond to the complaint of a resident about noise in the mobile home park. S and J, thus, did not undertake to render a service which it should have recognized as necessary for the protection of its residents.

As S and J's actions did not constitute an undertaking necessary for protection of its residents as to give rise to a duty under § 323, we need not consider whether S and J's failure to exercise reasonable care increased the risk of such harm or the harm was suffered because of the others' reliance upon the undertaking. Restatement (Second) of Torts § 323(a) and (b) (1964). The trial court properly concluded that S and J owed no duty to the plaintiffs as a matter of law.

## Restatement (Second) of Torts § 324A (1964)

The plaintiffs further argue that a duty arose under Restatement (Second) of Torts § 324A (1964) and S and J was negligent in the services it rendered to Isaac. This provision was adopted by this court in *Schmeck v. City of Shawnee*, 232 Kan. 11, 25-27, 651 P.2d 585 (1982). Restatement (Second) of Torts § 324A (1964), Liability to Third Person for Negligent Performance of Undertaking, provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

The plaintiffs argued that Isaac was the third-party beneficiary of the services to be rendered to his parents John and Linda South by S and J. They reason that S and J entered into an agreement with John and Linda to enforce the community guidelines which were for the benefit of their minor son, Isaac.

S and J argued that § 324A is not applicable to this action because S and J did not undertake or display a willingness to undertake services for the benefit of *a third party*. S and J compares this case to *Cunningham* where the court held that § 324A "lacks even arguable applicability to the situation before us" where there was no third party to be benefitted or protected. The court found that if a duty arose, it flowed only from the store's undertaking to provide services directly to another, the customer plaintiffs, under § 323. 276 Kan. at 891. S and J contends that Isaac likewise fails to qualify as a third party under § 324A because he was listed as a resident in the lease agreement, and similar to *Cunningham,* any undertaking would be a direct relationship with no third party involved.

In light of our analysis above, we conclude that no duty arose under § 324A because S and J did not undertake to perform services for the protection of a third person or his or her things. Additionally, we note that even if such an undertaking occurred, although John and Linda South were the only ones who signed the rental agreement and the community guidelines, Isaac was specifically listed as a resident of Green Acres in the rental agreement and thus was subject to the same rules and conditions for residing in Green Acres as his parents. As in *Cunningham,* if a duty arose, it flowed from landlord S and J's undertaking to provide services *directly* to Isaac for his safety as a resident or tenant of Green Acres and does not involve a third party as is required by § 324A. The plaintiffs' reliance upon § 324A is misplaced.

Affirmed.

LUCKERT, J., not participating.

LOCKETT, J., retired, and LARRY T. SOLOMON, District Judge, assigned.