This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                          **NO. 28,288**

**OLIVER STANLEY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Ross C. Sanchez, District Judge**

Gary K. King, Attorney General
Anita Carlson, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Will O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**KENNEDY, Judge.**

Oliver Stanley (Defendant) appeals his convictions for four counts of criminal

sexual penetration in the second degree (CSP II), two counts of criminal sexual contact of a minor in the third degree (CSP III), and one count of bribery of a witness. He argues that the jury should have been instructed on statutory rape as a lesser-included offense of CSP II and that the State violated his right to a speedy trial by delaying his case for thirty-six months. For the reasons discussed below, we affirm Defendant's convictions.

## I.    BACKGROUND

The State alleged Defendant committed CSP II by coercion when he sexually penetrated Victim on four separate occasions. At the time of the crimes, Victim was living in Defendant's home with his fiancé, Esther, who is Victim's older sister and legal guardian. When Esther discovered Defendant had engaged in intercourse with Victim, she called the police and removed both herself and Victim from Defendant's home.

The State asserted that Defendant was guilty of CSP II by coercion because he used his position of authority as head of the household to unduly influence Victim to have sex with him. Defendant argued that he had no authority over Victim and that she therefore could not have felt coerced. Defendant did not testify; his case relied instead upon Victim's unexpressive testimony and upon cross-examination of both Victim and Esther.

At the close of the evidence, Defendant requested the jury be instructed on both CSP II by coercion and the lesser-included offense of CSP of a minor (statutory rape). He argued that under the cognate approach adopted in *State v. Meadors*, 121 N.M. 38, 44, 908 P.2d 731, 737 (1995), he was entitled to such an instruction. Specifically, he argued that the evidence adduced at trial could be reasonably interpreted to support a statutory rape charge; for instance, the jury could have chosen to disbelieve that he used his position of authority to coerce Victim into sex and instead chose to convict him of statutory rape based on evidence that he was more than four years older than Victim. After considering extensive argument on the matter, the district court refused Defendant's request to instruct the jury on statutory rape, and the jury returned a conviction for, among other charges, four counts of CSP II by coercion. Defendant then unsuccessfully moved for a mistrial on the basis that the statutory rape instruction was not given. He makes two arguments on appeal: first, he contends that under the cognate approach, the district court improperly refused to instruct the jury on the lesser-included offense of statutory rape; and second, he argues he was deprived of a speedy trial.

**II.    DISCUSSION**

**A.    Lesser-Included Offense Instruction**

"The propriety of jury instructions is a mixed question of law and fact. When

3

considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instruction[s]. Viewing the facts in that manner, we review the issue de novo." *State v. Contreras*, 2007-NMCA-119, ¶ 8, 142 N.M. 518, 167 P.3d 966 (alteration in original) (internal quotation marks and citation omitted).

The Rules of Criminal Procedure permit the jury to find a defendant guilty of an offense that is necessarily included in the greater offense, where the lesser offense is instructed. *See* Rule 5-611(D) NMRA. "We use the terms 'lesser-included' and 'necessarily-included' interchangeably." *Meadors*, 121 N.M. at 41 n.2, 908 P.2d at 734 n.2. "'The rules regarding lesser-included offenses developed at common law to aid the prosecution in cases in which its proof may have failed as to the higher offense charged but nonetheless was sufficient to support a conviction on a lesser offense.'" *State v. Munoz*, 2004-NMCA-103, ¶ 9, 136 N.M. 235, 96 P.3d 796 (quoting 5 Wayne R. LaFave, et al., *Criminal Procedure* § 24.8(d), at 574 (2d 1999)). "New Mexico common law extended the right to lesser-included offense instructions to defendants under appropriate circumstances." *Munoz*, 2004-NMCA-103, ¶ 9.

*Meadors* provides guidance for how courts should analyze whether one crime constitutes a lesser-included offense of another. "First, the trial court should, when faced with a request . . . for a lesser-included offense instruction, grant the request

4

when the statutory elements of the lesser crime are a subset of the statutory elements of the charged crime." 121 N.M. at 44, 908 P.2d at 737. This is commonly referred to as the "strict elements approach." *Id.* Defendant does not argue this issue. He instead focuses on the remaining prongs of the *Meadors* standard, an inquiry commonly referred to as the "cognate approach." *Id.* at 43-44, 908 P.2d at 736-37.

> [T]he trial court should grant [a lesser-included offense] instruction if (1) the defendant could not have committed the greater offense in the manner described in the charging document without also committing the lesser offense, and therefore notice of the greater offense necessarily incorporates notice of the lesser offense; (2) the evidence adduced at trial is sufficient to sustain a conviction on the lesser offense; and (3) the elements that distinguish the lesser and greater offenses are sufficiently in dispute such that a jury rationally could acquit on the greater offense and convict on the lesser.

*Id.* at 44, 908 P.2d at 737. All three prongs must be satisfied to entitle a party to a lesser-included offense instruction. *See, e.g.*, *Contreras*, 2007-NMCA-119, ¶¶ 23-24 (affirming the district court's refusal to instruct the jury on the lesser-included offense because the defendant failed to establish the third prong of the *Meadors* test); *State v. Collins*, 2005-NMCA-044, ¶¶ 13-16, 137 N.M. 353, 110 P.3d 1090 (examining all three prongs and holding that because they were all met the defendant was entitled to the instruction), *overruled on other grounds by State v. Willie*, 2009-NMSC-037, 146 N.M. 481, 212 P.3d 369. We also note that the cognate analysis has been described as tailored to the state's request for a lesser-included offense instruction, while the

5

contours of the analysis for a defendant's request have remained somewhat undefined. *See State v. Darkis*, 2000-NMCA-085, ¶ 14, 129 N.M. 547, 10 P.3d 871. In determining whether the three prongs of the standard have been met, we must "look[] to the elements of the respective offenses, not in the abstract, but as seen through the prism of the charging documents and the facts alleged therein." *State v. McGee*, 2002-NMCA-090, ¶ 10, 132 N.M. 537, 51 P.3d 1191; *see Meadors*, 121 N.M. at 44, 908 P.2d at 737. We begin by first laying out the elements of the crimes at issue and then proceeding to a consideration of each prong of the *Meadors* cognate approach.

The statutory elements of CSP II by coercion in effect at the time Defendant was charged provide, in relevant part:

> D. Criminal sexual penetration in the second degree consists of all criminal sexual penetration perpetrated:
>
> (1) on a child thirteen to eighteen years of age when the perpetrator is in a position of authority over the child and uses this authority to coerce the child to submit[.]

NMSA 1978, § 30-9-11(D)(1) (2003) (amended 2009). The elements of statutory rape, also called CSP IV, in relevant part, are as follows:

> F. Criminal sexual penetration in the fourth degree consists of all criminal sexual penetration:
>
> (1) . . . perpetrated on a child thirteen to sixteen years of age when the perpetrator is at least eighteen years of age and is at least four years older than the child and not the spouse of that child[.]

6

Section 30-9-11(F).

**1.     Notice and the Charging Document**

Under the first prong of the cognate approach, we analyze the State's assertions in the charging document to determine whether, under the specific language found there, "the defendant could not have committed the greater offense . . . without also committing the lesser offense." *Meadors*, 121 N.M. at 44, 908 P.2d at 737. Such an analysis ensures the defendant's due process right to notice of the charges against him because the charging document "serves as a reliable indicator of the [s]tate's theory." *Darkis*, 2000-NMCA-085, ¶ 17. Accordingly, in a case such as this where Defendant (not the State) requested the lesser-included offense instruction, notice is not an issue. *See Munoz*, 2004-NMCA-103, ¶ 12 (holding that "lack of notice to the defendant is not a concern when the defendant himself requests the instruction"). Indeed, the facts clearly demonstrate Defendant was sufficiently apprised of the charges against him. The State charged him specifically with CSP II by coercion and gave no indication that it would pursue any other theory of rape, statutory or otherwise. It was Defendant who requested the statutory rape instruction, and he therefore did not suffer any surprise by the manner in which the State sought to instruct the jury on CSP II.

**2.     The Evidence Adduced at Trial**

The second prong of the cognate approach requires courts to view the evidence

to determine whether it could have supported a conviction under the requested lesser-included offense instruction. *See Meadors*, 121 N.M. at 42-43, 908 P.2d at 735-36. Defendant dedicates much of his brief to this question. He argues the district court erred when it concluded that the parties' ages were insufficiently established to support a conviction for statutory rape. We disagree.

Under *Meadors*, a party is entitled to a lesser-included offense instruction when the evidence supporting the lesser offense was presented at trial pursuant to the state's theory of the case and was somehow necessary to prove the *greater* offense. *See, e.g.*, *State v. Neatherlin*, 2007-NMCA-035, ¶ 24, 141 N.M. 328, 154 P.3d 703 (holding that the defendant was entitled to an instruction on the lesser offense of misdemeanor aggravated battery where the evidence that would support that charge was the same evidence presented for the greater charge of aggravated battery with a deadly weapon); *Collins*, 2005-NMCA-044, ¶ 15 (holding that the state was entitled to a lesser offense instruction for DWI where the state presented evidence of the defendant's breath alcohol content as the basis for its case for aggravated DWI); *Munoz*, 2004-NMCA-103, ¶¶ 7, 16 (holding that the defendant was entitled to the lesser offense instruction for DWI in the state's case against him for great bodily injury by vehicle because the state presented evidence that the defendant was intoxicated while driving pursuant to its theory that his intoxication was the proximate

8

cause of the collision); *Darkis*, 2000-NMCA-085, ¶¶ 18-19 (holding that the defendant was entitled to a lesser offense instruction for possession of drug paraphernalia where the state presented evidence of the drug paraphernalia to prove the defendant's possession of cocaine, the greater charge). As stated previously, CSP II by coercion requires proof of (1) sexual penetration, (2) a child between thirteen and eighteen years of age, and (3) a person in a position of authority who uses that authority to coerce the child into submission. *See* § 30-9-11(D)(1). In contrast, statutory rape requires proof of (1) sexual penetration, (2) a child between thirteen and eighteen years of age, and (3) a person older than eighteen years of age who is at least four years older than the child and is not the child's spouse. *See* § 30-9-11(F). Comparing these elements with the evidence presented at trial, the district court found that the second prong of the cognate approach was not met because there was insufficient evidence presented to establish the difference between the ages of Victim and Defendant. As the court concluded, "The evidence adduced at trial is not sufficient to sustain a conviction on [statutory rape]. [D]efendant's age was not adduced at trial." Thus, "[t]he age difference required by [statutory rape] has not been accomplished in evidence and the jury is not allowed to speculate."

The district court was partly mistaken in its conclusion. Our review of the record indicates that evidence *was* presented at trial which established Defendant's

9

age. Nevertheless, we agree with the district court that the second prong of the cognate approach was not met because, although such evidence was presented, it was of negligible value and entirely incidental to the State's theory of the case. The parties prepared and argued their cases under the State's theory that Defendant was in a position of authority, as Victim's guardian's fiancé and head of the household in which Victim resided, and that he used that position to coerce Victim. Defendant's age was mentioned only twice, both times in order to identify him as the offender, not to establish the element of authority necessary for CSP II. For example, Defendant's age came in through the testimony of Victim's examining nurse, who testified that when asked to identify the offender, Victim identified Defendant as forty-two-year-old Oliver Stanley. She did not specify the source of this indirect evidence of Defendant's age. Defendant's age was also alluded to, but not explicitly stated, in the testimony of his older brother, Sylvester Stanley. This testimony was elicited on cross-examination and seems to be either a form of impeachment to establish that the witness did not know his brother very well or to corroborate the identity of Defendant. The State's next question was: "He doesn't have an identical twin, does he?"

As a result, we agree with the district court's conclusion that the second prong of the cognate approach was not met due to the incidental and indirect nature of this evidence which was not admitted to support the State's theory of the case.

**3.      The Lesser Offense Not Reasonably the Greatest Crime Committed**

Nevertheless, even if we assumed that the second prong of the cognate approach *was* met as Defendant contends, analysis of the third prong would mandate affirmance under *Meadors*. *See, e.g., Contreras*, 2007-NMCA-119, ¶¶ 23-24 (refusing to address whether the district court misapprehended the showing required for the lesser offense under the second prong of the cognate analysis because the third prong was not met). Under that prong, Defendant must demonstrate "some view of the evidence pursuant to which the lesser offense is the highest degree of crime committed, and that view must be reasonable." *State v. Lente*, 2005-NMCA-111, ¶ 14, 138 N.M. 312, 119 P.3d 737 (internal quotation marks and citation omitted). Defendant argues that a reasonable jury might find that statutory rape was the highest degree of crime committed. Such a jury might reasonably reject the State's theory that Victim submitted to intercourse due to Defendant's position of authority. He argues that Victim never directly testified that she submitted as a result of Defendant's position of authority. Defendant also points out that Victim did not know why she had sexual intercourse with him, stating she felt "confused." Defendant did not occupy a position of authority, he contends, because he was not Victim's parent or legal guardian, Victim did not respect him, and because Victim thought Esther's subservience to him was "pathetic." Defendant correctly cites Victim's testimony above but fails to note

how consistently undescriptive and taciturn she was as a witness under both direct and cross-examination. While Defendant correctly cites Victim, his assertion that a reasonable jury could have chosen to disbelieve the State's theory that he coerced her from a position of authority denies the overwhelming weight of evidence against him. Indeed, evidence of his position of authority and coercion of Victim was almost entirely uncontradicted and firmly establishes that he used his position of authority to coerce Victim into submission.

"Position of authority' is defined as a position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to exercise undue influence over a child." *State v. Lamure*, 115 N.M. 61, 66, 846 P.2d 1070, 1075 (Ct. App. 1992) (internal quotation marks and citation omitted). "Undue influence has been defined as the result of moral, social, or domestic force exerted upon a party, so as to control the free action of his [or her] will[.]" *Id.* (internal quotation marks and citation omitted).

The evidence presented at trial overwhelmingly demonstrated both coercion and Defendant's position of authority. Victim arrived in Defendant's home after experiencing abuse and neglect at the hands of her parents. The State presented uncontroverted evidence that social services removed her just before she turned thirteen years old from her parents' home on an isolated mesa on the Navajo

reservation. At trial, Victim reported the erratic behavior of her parents; rarely returning home at times and other times never leaving the house. In her home, Victim commonly witnessed domestic abuse between her parents and physical fights between her three older brothers. Victim testified that she felt alone, did not have anyone to talk to about the problems at home, and did not know where else she could live. Victim was placed in a group home for troubled children for two or three months and then placed with Esther, who was nineteen at the time. Esther was named her legal guardian and given power of attorney over her. Social services had no other family placement options for Victim and was unwilling to place her back in her parents' home. As part of Victim's living arrangement, she stayed with Defendant and Esther in Defendant's three-bedroom trailer in Albuquerque. Defendant was Esther's fiancé, whom Victim had met before she was placed with them. When she moved in, Victim did not know how long she would be able to live with Defendant and Esther.

After arriving in Defendant's home, a family dynamic in which Defendant occupied the role of father quickly emerged. While Victim lived in the trailer, she stayed home most of the time and watched television with Defendant and Esther. Defendant was in charge of the household. He was demanding, controlling, and told Victim what to do—she complied. Defendant controlled all the money in the household, even Esther's work income, giving her an allowance, money for shopping,

and expecting receipts in return. Defendant also gave Victim an allowance, demanding that she have cleaning chores in the home, performed to his satisfaction. Victim and Defendant got along in the beginning, but she reported that Defendant would get angry and become physically and verbally violent. Both Victim and Esther testified that Defendant would often yell at and beat Esther many times in Victim's presence. Testimony also established that Defendant was a large man, over six feet tall, weighing over 300 pounds. We hold that such evidence establishes Defendant's dominance over domestic life in the home, sufficient from which a reasonable jury would infer the degree of influence described by the State.

In June 2003, approximately four months after Victim moved into Defendant's home, he began touching her sexually when Esther was not at home. One morning, when Victim woke up, she went to the kitchen to make breakfast and Defendant stopped her and told her to take off her clothes and get on the floor. He laid on top of Victim and forced his penis inside her vagina. Victim testified that Defendant told her not to tell anyone or he would hurt Victim and her family. On another occasion, Defendant told Victim to come into his room, where he was standing in the doorway naked. Victim hesitated, but eventually complied. Defendant removed Victim's clothes, told her to get on the bed and forced his penis inside her vagina again. Victim wrote in her journal that Defendant said he would kill her and her family if she told

14

anyone, and wrote that "'[h]e had sex with me and I hate him.'" In four other instances, all occurring in his home, Defendant penetrated Victim twice with his fingers, once with his tongue, and made Victim perform fellatio on him. Victim wrote in her journal that she was "really scared" during this time and scared to tell Esther about Defendant.

The final sexual encounter between Defendant and Victim occurred on the evening of June 12, 2003, when Esther went to bed, leaving Defendant and Victim in the living room watching television. Once Esther was gone, Defendant turned up the volume on the television, lifted up Victim's shirt, kissed her breasts, penetrated her vagina with his fingers, and attempted to have intercourse with her. Esther felt suspicious that something was wrong, heard strange noises coming from the living room, and saw what she thought might be inappropriate touching. She walked into the room and stopped Defendant. Esther yelled to him, "What the hell are you doing?" Defendant yelled back at Esther, then he slapped her, pushed her down on the couch, and beat her. Victim wrote in her journal that although she was worried about Esther, she was relieved that she did not "have to do this anymore [with Defendant]." Esther testified that Victim was scared that night. Victim had asked them not to fight, ran into her room, and stayed there until the next morning, when Defendant opened her door and told her to come out and eat her breakfast. That day,

Victim returned to her room and stayed there until Defendant left the house, at which time Esther called the police. One of the officers took Victim to the hospital. Victim and Esther moved out of Defendant's house and into a shelter. At the time of trial, Victim was enrolled in a Native American boarding school in Oklahoma where she had attended since the school year after she left Defendant's home.

Defendant presented no evidence, aside from that previously stated, to refute these facts and offered no reasons for how a reasonable jury might ignore the State's theory of CSP II by coercion and convict him instead of statutory rape. Indeed, Victim testified that she engaged in the sexual acts with Defendant out of fear that he might hurt her. Our review of the evidence shows a troublesome picture of a confused, thirteen-year-old-girl confronted by an authority figure's manipulative, erratic, and domineering behavior. Although Victim's testimony was somewhat non-expressive in nature, there can be little ambiguity as to Defendant's position of authority—one which was used to coerce Victim into engaging in sex. There was almost no evidence presented to refute this conclusion, and we agree with the district court's conclusion, because as the court emphasized, the elements distinguishing the crime of CSP II from statutory rape—namely, a position of authority and coercion—were not sufficiently in dispute that a jury could rationally acquit Defendant on CSP II. *See Neatherlin*, 2007-NMCA-035, ¶ 24 (stating that the third

16

prong of the cognate approach asks whether "[t]he element that distinguished the lesser and greater offenses . . . was 'sufficiently in dispute such that a jury rationally could acquit on the greater offense and convict on the lesser.'" (quoting *Darkis*, 2000-NMCA-085, ¶ 14)); *Munoz*, 2004-NMCA-103, ¶ 17. We affirm the district court's denial of Defendant's requested lesser-included offense instruction.

**B.      Speedy Trial**

Defendant argues that the district court erred by denying his motion to dismiss for violation of his right to a speedy trial. In reviewing a district court's denial of a speedy trial claim, we give deference to the facts found below. *See State v. Maddox*, 2008-NMSC-062, ¶ 8, 145 N.M. 242, 195 P.3d 1254, *modified on other grounds as recognized by State v. Valencia*, 2010-NMCA-005, ¶¶ 18-19, 147 N.M. 432, 224 P.3d 659 (filed 2009). Weighing and balancing the speedy trial factors are legal decisions, which we review de novo. *Id.* In analyzing whether a defendant was denied a speedy trial, we "consider the following factors: (1) the length of the delay, (2) the reasons given for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) prejudice to the defendant. We begin by considering the length of the delay." *State v. Lopez*, 2009-NMCA-127, ¶ 20, 147 N.M. 364, 223 P.3d 361 (citation omitted), *cert. denied*, 2009-NMCERT-010, 147 N.M. 452, 224 P.3d 1257.

**1.      Length of Delay and Presumption of Prejudice**

The length of delay in trying a defendant is not alone determinative of whether his right to a speedy trial has been violated. *See State v. Garza*, 2009-NMSC-038, ¶ 23, 146 N.M. 499, 212 P.3d 387. The analysis is relevant for two purposes: (1) making the threshold determination of whether the gross length of the delay was presumptively prejudicial; and more importantly, (2) triggering a consideration of that delay as part of the speedy trial analysis. *Id* ¶ 24. "We calculate the length of delay from the date the Sixth Amendment right to a speedy trial attached when the defendant becomes an accused, that is, by a filing of a formal indictment or information or arrest and holding to answer." *Maddox*, 2008-NMSC-062, ¶ 10 (internal quotation marks and citation omitted).

Defendant was indicted on June 30, 2004, nearly thirty-six months before his trial finally commenced. Such a length of delay is presumptively prejudicial under the guidelines established for complex cases as in *Garza*, 2009-NMSC-038, ¶¶ 2, 48, which states that any delay longer than fifteen months is presumptively prejudicial. *Id.* The district court found Defendant's case to be complex, and neither party disputes that the amount of delay was presumptively prejudicial. We therefore defer to the district court's conclusion that this case was complex. *See State v. O'Neal*, 2009-NMCA-020, ¶ 16, 145 N.M. 604, 203 P.3d 135 (filed 2008) (holding that we must defer to district court rulings on complexity as long as they are supported by

substantial evidence).

Where the length of the delay is presumptively prejudicial, we continue to an analysis and balancing of the *Barker* factors: (1) the length of delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) the actual prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Zurla v. State*, 109 N.M. 640, 642, 789 P.2d 588, 590 (1990) (adopting the balancing test in *Barker*), *modified on other grounds by Garza*, 2009-NMSC-038. In *Garza*, the Supreme Court clarified that a "'presumptively prejudicial' length of delay is simply a triggering mechanism, requiring further inquiry into the *Barker* factors," not a delay that carries forward a presumption of prejudice. *Garza*, 2009-NMSC-038, ¶ 21.

"[T]he greater the delay the more heavily it will potentially weigh against the [s]tate." *Id.* ¶ 24. Thus, reconsidering the length of delay as part of the *Barker* balancing test, we hold that this thirty-six-month delay was extraordinary, even for a complex case, and weighs against State. *See Maddox*, 2008-NMSC-062, ¶ 12 (stating that a "twenty-eight-month delay is extraordinary and, therefore, presumptively prejudicial"). The State makes no argument as to how we might weigh such a lengthy delay differently.

**2.      Reasons for the Delay**

The length of a delay, however, is closely linked to the reasons that caused it. *See Garza*, 2009-NMSC-038, ¶ 25. "The reasons for a period of . . . delay may either heighten or temper the prejudice to the defendant caused by" its length. *Maddox*, 2008-NMSC-062, ¶ 13. There are several types of delay, each of which weighs against the state to a differing degree. *Garza*, 2009-NMSC-038, ¶ 25. Deliberate delay in an attempt "'to hamper the defense should be weighted heavily against the government.'" *Id.* (quoting *Barker*, 407 U.S. at 531). Negligent or administrative reasons for delay are more neutral and weigh more lightly against the state. *Id.* ¶ 26. Government preparation in pretrial delay, such as locating witnesses and opposing defense motions, are valid reasons that "justify appropriate delay." *Id.* ¶ 27 (quoting *Barker*, 407 U.S. at 531). On appeal, Defendant reasserts his arguments before the district court regarding the reasons for the delay. Specifically, he contends that the State delayed production of a DNA report until three days before the third trial setting, produced DNA results along with almost one-hundred pages of evidence six days prior to trial, and unnecessarily delayed obtaining DNA evidence from him. Such delays, the district court concluded, should weigh slightly against the State. We agree. These delays, which may have taken longer than necessary due to administrative or simply negligent reasons, were still the result of valid trial preparation for a complex

case. *See id.*

Other delays in this case weigh against Defendant. For instance, he made a special request for an electronic copy of the State's DNA report, which he then sent to California for testing by an independent laboratory. This request, made five months after Defendant received the State's paper copy, delayed his case an additional fourteen months and could have been completely averted had Defendant simply utilized the State's paper copy instead of awaiting the digital report. We agree with the district court's interpretation of Rule 5-501 NMRA, which does not require the State to provide electronic discovery. Furthermore, of the thirteen trial dates, which had to be rescheduled in this case, ten were stipulated to by Defendant. What is more, of the seven extensions obtained pursuant to Rule 5-604 NMRA petitions, Defendant stipulated to five. Where there are stipulated continuances and extensions, that time will not be weighed against the State. *See State v. Downey*, 2007-NMCA-046, ¶ 40, 141 N.M. 455, 157 P.3d 20, *rev'd on other grounds by* 2008-NMSC-061, 145 N.M. 232, 195 P.3d 1244. In the last extension request, filed on April 10, 2007, the State explained that although opposed by Defendant, the request should be granted because of various delays caused by Defendant which included: (1) his request for more time to consider the plea offer, (2) his rejection of the State's plea offer the previous week, (3) his own failure to file a witness list, (4) the fact that he had several motions yet to

file, (5) his requests for second interviews of two witnesses, and (6) the fact that he had not yet done a first interview with Victim. This extension was granted in order to accommodate the defense's long-delayed need for preparation, and the trial began on June 25, 2007. Notwithstanding Defendant's opposition to this extension, we will not charge the State with this delay because it was granted by the court for the purpose of giving Defendant additional time to prepare his case. Thus, despite the lengthy delay in bringing Defendant to trial, most of the delay was caused by Defendant or done for his benefit. We therefore weigh this factor against Defendant.

**3.      Defendant's Assertion of the Right**

We now consider the frequency and force with which Defendant's speedy trial right was asserted. *See Garza*, 2009-NMSC-038, ¶ 32. In doing so, we consider the context in which he objected to the delay, not only whether and how often Defendant demanded a speedy trial, but also whether his own procedural maneuvers resulted in any trial delays. *Id.* On August 12, 2004, Defendant filed a demand for a speedy trial. Thereafter, he stipulated to several continuances, six-month-rule extensions, and rescheduled trial dates. On January 13, 2005, he filed a motion to exclude the State's DNA evidence and again demanded a speedy trial. As set forth in the previous section, Defendant requested an electronic form of the DNA report five months after he filed the motion to exclude the DNA evidence. Based on these facts, the district

22

court observed that Defendant's interest in a speedy trial was inconsistent with his actions. Defendant did not raise any further demands for a speedy trial until May 1, 2007—two and a half years after his motion to exclude the DNA evidence and demand for a speedy trial. During that time, Defendant stipulated to at least ten extensions, mostly because of his desire for independent DNA analysis. Defendant's agreement to six-month-rule extensions precludes assertion of his right to a speedy trial for the time of the extensions. *See O'Neal*, 2009-NMCA-020, ¶ 22. Because the delay in this case was largely attributable to Defendant, his assertions of the right to a speedy trial, when placed in context, do not persuade this Court that he was overly-concerned about the delay. We weigh this factor in the State's favor.

**4.      Prejudice from the Delay**

The focus of a speedy trial analysis is on undue prejudice. *See State v. Coffin*, 1999-NMSC-038, ¶ 69, 128 N.M. 192, 991 P.2d 477. "The United States Supreme Court has identified three interests under which we analyze prejudice to the defendant: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Maddox*, 2008-NMSC-062, ¶ 32 (internal quotation marks and citation omitted). Any anxiety resulting from pretrial incarceration must be undue in nature. *Garza*, 2009-NMSC-038, ¶ 35. The oppression and anxiety suffered depends upon the length of

23

incarceration, any time of pretrial release, and the specific, non-speculative prejudicial effects that resulted. *Id.* In the present case, Defendant's argument is too thin for this Court to act upon.

Defendant was released on bond after his arraignment and placed in the Community Corrections Program. The conditions of his release prevented him from leaving Bernalillo County and required him to have weekly contact with his lawyer. Defendant presented some specific evidence of prejudicial effects resulting from these conditions; for instance, he argued that he was prejudiced by missing family reunions, family funerals, three weddings, his son's graduation from junior high school, and his son's basketball games. He also presented evidence that he lost nearly one-hundred pounds over the preceding three years (which we cannot with certainty classify as a negative consequence) and had lost a few out-of-town jobs. The record also indicates, however, that Defendant was given an ankle bracelet and was permitted to work out-of-state and stay overnight. It also appears that he was able to maintain his job as a truck driver and was remanded to prison only three times for short periods during the thirty-six-month pretrial period.

We agree with the district court that Defendant was not subjected to oppressive pretrial incarceration. Although Defendant articulated that certain restrictions on his liberty bore somewhat prejudicial consequences, such consequences were not undue

and certainly not extraordinary. Thus, this Court is not persuaded that Defendant's anxiety was excessive beyond that inherent to being accused of serious crimes. We weigh these prejudicial effects only slightly in Defendant's favor.

Of greatest concern in considering prejudice is the possibility that a delay actually impaired preparation of the defense. *See Garza*, 2009-NMSC-038, ¶ 36. In this case, however, because the reasons for the delay are significantly attributable to Defendant's own maneuvers, any prejudice he suffered is greatly offset. *See Maddox*, 2008-NMSC-062, ¶ 13. Defendant does not point to any specific impairment of his defense and therefore fails to satisfy his burden of production to substantiate prejudice of this type. *See id.*; *Garza*, 2009-NMSC-038, ¶ 36. We weigh this factor in favor of the State.

**5. Balancing**

No one factor has talismanic qualities under our speedy trial analysis, *see Maddox*, 2008-NMSC-062, ¶ 36, but where the defendant does not prove actual prejudice to his case, the state's ultimate burden of persuasion to show that there was no speedy trial violation is greatly reduced. *Id.* ¶ 32; *Garza*, 2009-NMSC-038, ¶ 22. Our Supreme Court has held that "[w]here the [s]tate can show that '[t]here were good reasons for the delay; the defendant did not timely assert his right and acquiesced in the delay; or the defendant was not actually prejudiced by the delay,' the [s]tate

25

discharges its burden to show that on balance the defendant's speedy trial right has not been violated." *Maddox*, 2008-NMSC-062, ¶ 36 (third alteration in original) (citation omitted).

In the current case, the delay of thirty-six months was significantly attributable to Defendant's pretrial motions and his desire for an independent DNA analysis. He acquiesced in much of the delay by numerous stipulations to extensions, requested to accommodate both parties' trial preparations. As a result, Defendant fails to show that his defense was actually impaired by the delay. On balance, the weight of the unusually long delay is highly tempered by the reasons for the delay and the lack of actual prejudice. Defendant did not suffer oppressive pretrial incarceration, and though he demonstrated specific anxieties and restraints on his liberty, he does not show undue prejudice. Under these circumstances, we cannot say the delay violated his right to a speedy trial. *See id.* ¶ 37 (stating that a "total delay of twenty-eight months [was] presumptively extraordinary," but holding that several other factors weighed against the defendant, including a lack of undue prejudice to the defendant's case and the defendant's weak assertion of the right).

We therefore affirm the district court's denial of Defendant's motion to dismiss for violation of his right to a speedy trial.

**III.  CONCLUSION**

For the reasons set forth above, we affirm the district court's refusal of Defendant's requested jury instruction and its order denying Defendant's motion to dismiss for violation of his speedy trial right.

**IT IS SO ORDERED.**

_____

**RODERICK T. KENNEDY, Judge**

**WE CONCUR**:

_____

**CELIA FOY CASTILLO, Judge**

_____

**ROBERT E. ROBLES, Judge**